## THOMPSON v. CAMP.
### No. 10362.

Circuit Court of Appeals, Sixth Circuit.
Aug. 11, 1947.

Cooper Turner, of Memphis, Tenn. (Canada, Russell & Turner, of Memphis, Tenn., on the brief), for appellant.

Walter P. Armstrong, of Memphis, Tenn. (W. E. Hendrix, R. G. Draper, and Walter P. Armstrong, all of Memphis, Tenn., on the brief), for appellee.

Before HICKS, ALLEN, and MILLER, Circuit Judges.

MILLER, Circuit Judge.

This is an appeal from a judgment of the District Court awarding the appellee, Louise Camp, Administratrix of the estate of her husband, Irving Camp, deceased, the sum of $35,000 as damages for injuries received by the decedent while working as a switchman for the St. Louis-San Francisco Railway Company (hereinafter referred to as Frisco). The action was brought under the provisions of the Federal Employer's Liability Act, Title 45 U.S.C.A. §§ 51–60. The applicability of the Act is not questioned.

On April 26, 1945, Camp was engaged in switching operations on tracks used by the Frisco in and around what is known as K. C. Junction in Memphis, Tennessee. At the time of the accident, about 11:55 p. m., he was engaged as what is known as a pin puller, with duties consisting generally of lifting coupling pins so as to uncouple cars which were going to be released. Immediately prior to the accident the engine was coupled to seven cars which were to be delivered to the Southern Railway on an interchange track. Before this could be done it was necessary to remove four cars in the Southern track which were to be delivered to the Frisco. Accordingly, the seven cars were shoved into the Southern track and coupled onto the four cars standing there. The foreman, Van Hooser, gave instructions that the cut be pulled out of the Southern track and that the four cars for delivery to the Frisco be kicked into the Southern extension of the Frisco lead track. A cut of cars is kicked by having the engine shove the cars until the desired speed is reached, at which time the engine slows down with the result that the cars which are to be kicked, being either already uncoupled or being then uncoupled, roll on in the direction in which they are being kicked. The cars in such a case are uncoupled by the pin puller. The evidence is conflicting as to whether Camp was on the end of the seventh car from the engine, which was the last car in the cut that the engine would hold on to and would not kick, or whether he was riding on the adjoining end of the eighth car from the engine, this being the end of the cut of four cars which was to be detached. The engine shoved the cars toward the south, slowed down and brought it and the seven cars attached to it to a stop permitting the four cars which were being kicked to roll on free. Van Hooser then gave the engineer a signal to proceed back through the crossover where it would be in a position to put these seven cars into the Southern interchange track. When the engine and cars came to a stop, Camp was not on them. Hightower, an engineer on another engine in the yard, testified that between 11:50 p. m. and 12 o'clock he saw a lantern overturned on the ground, stopped his engine, got off and investigated. He found Camp sitting in a crouched position holding his head in his hands with his face dirty. He asked Camp what had happened and Camp told him that "he got off the cut, stepped in a hole, and slipped and fell." Camp's watch had stopped at 11:53.

Camp was treated at the hospital by Dr. M. B. Hendrix, a surgeon employed by the Frisco Employees Hospital Association, a general welfare corporation of Missouri, to which Camp belonged and to which he paid dues for the privilege of receiving hospital and medical benefits. The Association was governed by sixteen trustees eleven of whom were employees of the railroad chosen by the employees as their representatives. Dr. Hendrix's salary was paid by the Association, not by the appellant, al-

though in some matters, such as examining prospective employees, he was employed specially by the Frisco and paid by it. Dr. Hendrix advised Mrs. Camp that Camp had a brain concussion and a blood clot, together with severe lacerations. He was unconscious about three days and nights. After regaining consciousness, he complained of severe headaches. Dr. Hendrix made two spinal punctures which gave some relief, but did not stop the headaches. He was in the hospital from April 26th until May 9th, a period of 13 days, when he was released by Dr. Hendrix and permitted to go home. During his stay at home he visited Dr. Hendrix at his office on three occasions, the last one being on Saturday, June 2, 1945 at about Noon. Mrs. Camp was with him on this last visit and testified that Camp told Dr. Hendrix that his neck still hurt at times and he sometimes had dizzy spells, that Dr. Hendrix took his knee reflexes, looked at his eyes and "told him he was O.K., he could go back to work." Dr. Hendrix testified that Camp stated, in answer to his questions, that he was all right and wanted to return to work. Camp got in touch with Henry Westbrooke, local claim agent for the Frisco, during the evening. Westbrooke came to Camp's home and then took Mr. and Mrs. Camp to his office in the Grand Central Building in Memphis about 9:00 p.m. for the purpose of settling the claim before Camp returned to work on Monday. On two previous occasions Westbrooke had asked Camp for a statement about the accident, which Camp had declined to give at that time. At the office that evening Westbrooke took Camp's statement on the typewriter. There was no discussion between them about Camp's condition of health, what had been his trouble or when he would be well. Westbrooke asked Camp how much it would take to settle the case, and when Camp stated that he thought he should have $800 or $900 for the time he had lost and for the injuries, Westbrooke stated that there was no liability but that he would settle with Camp for $500, which he thought was all he should pay considering the time he had lost and that the injuries were no more serious than they were. This was a little more than, or approximately the same amount, Camp would have earned if he had worked over-

time during the time he was laid off. After giving it consideration, Camp accepted the proposition and signed a release prepared at that time by Westbrooke. The release recited Camp's claim for damages, the denial of liability on the part of the Frisco, and stated that Camp released the appellant "from any and all liability for all claims for all injuries, including those that may hereafter develop as well as those now apparent, and also do release and discharge them of all suits, actions, causes of action, and claims for injuries and damages which I have or might have arising out of the accident referred to, both to my person and property, as well as from all claims or demands of any kind whatsoever, and do hereby acknowledge full satisfaction of all such liability and causes of action." Westbrooke assisted them in cashing the check that evening. Camp returned to work Monday June 4th. He worked intermittently until June 17, 1945, when about 2:30 a.m. he collapsed and was taken to the hospital in an unconscious condition, where he died within a few hours. At the time of his death Camp was thirty-three, and had two sons, thirteen and ten years of age. A third son was born shortly after his death.

In her Bill of Complaint the appellee charged that Camp's injuries and death were the proximate result of appellant's negligence in that it failed to furnish Camp a reasonably safe place in which to work, and in particular that it was carrying on switching operations over tracks which had been permitted to become dangerous and unsafe by reason of large holes and excavations in the ground which made it necessary for Camp in the performance of his duties to alight on uneven ground, and that it had failed to have the place where Camp was required to work properly lighted, so as to disclose the dangers existing; that the release was secured by reason of appellant misrepresenting to Camp that he had fully recovered from the accident, and that in any event the settlement was also made as the result of a mutual mistake of fact. The complaint prayed that the release be set aside and that the Adminstratrix recover damages in the sum of $100,000. The appellant denied the alleged negligence on its part and pleaded that Camp was guilty of contributory neg-

ligence, and that any alleged cause of action was barred by the release of June 2nd which was not the result of either fraud, misrepresentation or mutual mistake of fact. The District Judge empaneled an advisory jury, which found (1) that the release was not executed as a result of fraud on the part of the appellant, and (2) that the release was executed as the result of a mutual mistake of fact on the part of the appellant and the deceased, and on the questions of liability and damages found for the appellee in the amount of $35,000. The District Judge approved the verdict of the jury in all respects and rendered the judgment which is herein appealed from.

Appellant contends that his motions for a directed verdict at the close of the plaintiff's case and at the close of all the evidence should have been sustained, in that the evidence failed to show any negligence on the part of the Frisco which was the proximate cause of Camp's death, and in any event, the action was barred by the release which Camp executed on June 2nd; and that the evidence was insufficient to sustain the finding that the release was invalid as having been executed under a mutual mistake of fact.

We first consider the validity of the release. Federal law, rather than the law of Tennessee, is controlling. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 164 A.L.R. 387, Garrett v. Moore-McCormack Co., Inc., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239. Appellant concedes that a release for personal injuries can be set aside where the evidence is clear, unequivocal and convincing that it was excuted as the result of a mutual mistake of fact, but insists that a mistake by a physician or surgeon in prophecy or in opinion relative to an uncertain future recovery is not a mistake of either a present or past fact required by the rule. He relies chiefly upon Chicago & N. W. R. Co. v. Wilcox, 8 Cir., 116 F. 913, where the Court declined to set aside a release for personal injuries because it construed the mistake relied upon as a mistake of opinion or prophecy on the part of the doctor as to the duration of the disability which was not a mistake of a present fact, but was merely an opinion as to a future

uncertain event. This question is extensively briefed by both parties. While some conflict exists in the reported cases, the rule seems to have been settled in this circuit adversely to appellant's contention. In Lumley v. Wabash R. Co. 76 F. 66, 67, this Court held invalid, as having been executed under a mutual mistake of fact, a release for personal injuries excuted as a result of the attending surgeon's statement "that the contusion was trivial, and that the fracture would be entirely well in about eight weeks," and that the pain in the shoulder was due to the broken arm and wholly "sympathetic." Following the release, the shoulder trouble increased and it was subsequently discovered that the supposed sympathetic pain in the shoulder had an independent origin, the shoulder having been dislocated and fractured. The rule was there stated as follows:

"If one agrees that he will receive a given amount in satisfaction and settlement of his damages sustained through a particular accident, it is not essential that every possible consequence of the tort shall be mentioned, considered, or enumerated. The subsequent discovery by one giving such a release that he was worse hurt than he had supposed, would not, in and of itself, be ground for setting aside the settlement or limiting the release. We put our judgment upon the facts stated in this bill, to wit, that both parties supposed complainant had received certain injuries, the extent and character of which were considered and discussed with reference to the time which the injured party would probably lose in consequence thereof. In such a case, if a release is given specifically mentioning the particular injuries known and considered as the basis of settlement, general language following will be held not to include a particular injury then unknown to both parties of a character so serious as to clearly indicate that, if it had been known, the release would not have been signed."

The same question was later considered by this Court in Southern Railway Company v. Clark, 233 F. 900, 904. The Court approved the ruling in the Lumley case and again held invalid a release executed as the result of the mistaken opinion of the attend-

ing physician as to the character and extent of the claimant's injuries. The Court there said—"we cannot think that the representation as to plaintiff's complaint of injury to his loins and groin was a bare expression of opinion; it was more than this; its tendency and effect were clearly to influence the plaintiff and to bring about the settlement now in issue." Decisions from other circuits have also disagreed with, and in some instances criticised, the ruling in Chicago & N. W. R. Co. v. Wilcox, supra, and followed the ruling previously announced in this circuit. Great Northern R. Company v. Fowler, 9 Cir., 136 F. 118; Scheer v. Rockne Motors Corp., 2 Cir., 68 F.2d 942; Atlantic Greyhound Lines v. Metz, 4 Cir., 70 F.2d 166; Robert Hind, Limited v. Silva, 9 Cir., 75 F.2d 74; Montgomery Ward & Co. v. Callahan, 10 Cir., 127 F.2d 32. Even in the Eighth Circuit the rule as originally announced by that Court in Chicago & N. W. R. Co. v. Wilcox, supra, was not followed in a later similar case where the particular facts and equities involved convinced the Court that a different ruling should be made. Lion Oil Refining Company v. Albritton, 8 Cir., 21 F.2d 280. The facts in Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, also relied upon by appellant, go much beyond the facts which are under consideration in the present case.

In the present case it is clear that Camp had not recovered on June 2nd, when he was released by Dr. Hendrix, and was not in a satisfactory condition to return to work. The evidence is conclusive about his poor physical condition between that time and the day of his death, as shown by his exhaustion after a day's work and his inability to work every day. Dr. R. E. Semmes testified that in the light of subsequent developments he was not in a satisfactory condition to return to work. Yet, when we consider the evidence most favorable to the appellee, Dr. Hendrix told Camp he was O. K. and could go back to work. This was obviously a mistaken opinion, although given in good faith, about Camp's condition and the effect of the previous injury. Camp relied upon the doctor's opinion, at least with respect to the fact that his recovery was practically complete, that he could safely return to work and would not require any

further medical attention, and that there would not be any subsequent, unexpected developments. His release from further medical attention or supervision, the words used at the time of the release, and the failure to advise him of possible adverse developments or to restrict his physical activities, fully warranted Camp's belief that for all practical purposes he had recovered. The fact that such representations were made by one who was not an employee or agent of the appellant would be material if we were considering a case of fraud. But that issue was eliminated by the jury's verdict. Camp was acting under a mistake of fact regardless of how the mistake arose. The evidence shows that Westbrooke was also acting under the belief that Camp had recovered. He knew Camp had been released by Dr. Hendrix and was making the settlement in order to return to work. While Dr. Hendrix was not legally the agent or representative of the Frisco, yet he worked in conjunction with it and Westbrooke was undoubtedly relying upon Dr. Hendrix's actions in the matter and acting under the belief that Camp had recovered and was in condition to resume work. There was no discussion about his condition of health or any question raised about being able to return to work. The settlement was made almost entirely on the amount of time already lost from work. Such a factor was stressed in several of the opinions above referred to. In any event the finding of the jury, adopted by the District Judge, that the release was executed under a mutual mistake of fact, is not clearly erroneous and accordingly will not be set aside. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723c. We agree with the District Judge's conclusion of law that the release be set aside and is not a bar to this action.

Appellee introduced evidence that there was excavated and uneven ground by the track where the switching was being done, that the switch yard was not illuminated, that it was dangerous for a switchman to alight from a moving car under such conditions, and that it was the customary practice of the Frisco and other railroads in the vicinity of Memphis under such conditions to push the cars into place instead of

kicking them, which would make it unnecessary for the switchman to alight from a moving car. This evidence was sufficient to sustain the finding of both the jury and the District Judge that appellant's negligence was the proximate cause of Camp's injuries. Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916. Appellant contends that since Camp knew the condition of the yard, he could have alighted from the cut in a safe place instead of an unsafe place, and that his injuries were caused by his own negligence instead of by the negligence of appellant. But neither assumption of risk nor contributory negligence is a bar to an action under the Act as presently amended. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Hutchins v. Akron, Canton & Youngstown R. Co., 6 Cir., 162 F.2d 189.

■ Appellant's contention that there was no competent evidence that Camp was riding the cars that were being kicked, rather than those remaining with the engine, is not sound. The witness Hightower so testified. Camp's statement to Hightower, made immediately after the accident and under the conditions existing, was properly admitted in evidence under the res gestae rule. Fort Street Union Depot Co. v. Hillen, 6 Cir., 119 F.2d 307; Johnson v. Copeland, 178 Tenn. 431, 158 S.W.2d 986; National Life & Accident Ins. Co. v. Follett, 168 Tenn. 647, 80 S.W.2d 92.

■ We believe the evidence fully sustains the finding that the injuries received on April 26, 1945 were the proximate cause of decedent death on June 17, 1945. Both the hospital record and the death certificate, signed by Dr. Hendrix, stated "Cerebral Hemorrhage" as the cause of death. Although Dr. Hendrix testified that it was speculative whether or not the cerebral hemorrhage resulted from the previous injury and that he had never had such a result in his 35 years of industrial surgery, yet he conceded that it was possible. Dr. Semmes, a recognized specialist of many years experience in surgery of the brain, testified from the hospital record and hypothetically that the case was very typical of a slowly accumulating hemorrhage following a head injury and bleeding in the brain, and that, in his opinion, a chronic hemorrhage following a previous head injury caused his death. Lavender v. Kurn, supra; Highfill v. Louisville & Nashville R. R. Co., 6 Cir., 154 F. 2d 874.

■ Complaint is made that the District Judge admitted in evidence testimony relating to the custom of other railroads in vicinity of pushing cars into place instead of kicking them, under conditions similar to those in this case. However, the jury was also instructed that the custom was not controlling and that the customary way may or may not involve negligence, but that it could be considered along with other facts and circumstances of the case. We think that the ruling, together with the qualifying instruction, was not erroneous. Chapman & Dewey Lumber Co. v. Hanks, 6 Cir., 106 F. 2d 482; Brigham Young University v. Lillywhite, 10 Cir., 118 F.2d 836; Wigmore on Evidence, 3rd Edition, Section 461.

■ Complaint is made of the instruction given that Camp had the right to expect and act upon the assumption that the Frisco would exercise ordinary care in the operation of its trains and in the maintenance of its premises in the absence of any circumstances that should have reasonably put Camp on notice to the contrary. It is pointed out that Camp had knowledge of the condition of the premises and that the cars were to be kicked before he entered into the work. Appellant concedes that the instruction was a correct statement of the law, but claims that in view of the facts it was inapplicable. Even conceding it to be inapplicable, it was not prejudicial. The District Judge also gave an instruction on contributory negligence on the part of Camp, which necessarily gave effect to any knowledge that Camp may have had about the condition of the premises.

■ Appellant also took exception to the ruling of the District Judge which admitted evidence as to the price for which an insurance company would sell an annuity of $3000 per year to a man forty years of age (the lowest age shown by the annuity table). The difference between that age and Camp's age was in appellant's favor. In his reply brief he concedes that annuity tables are

admissible. See Vicksburg, etc., R. Co. v. Putnam, 118 U.S. 545, 7 S.Ct. 1, 30 L.Ed. 257; Whelan v. New York, L. E. & W. R. Co., C.C.E.D. Ohio, 38 F. 15, 18. In permitting the evidence to be introduced the Court ruled that it was not controlling, but was a type of evidence for the jury to consider. When coupled with a proper instruction on the measure of damage, as hereinafter pointed out, such a ruling is not erroneous. Baltimore & Ohio R. Co. v. Henthorne, 6 Cir., 73 F. 634, 641; Colusa Parrot Mining & Smelting Co. v. Monoham, 9 Cir., 162 F. 276, 282. See also Chesapeake & O. R. Co. v. Kelly, 241 U.S. 485, at page 490, 36 S.Ct. 630, at page 632, 60 L.Ed. 1117, L.R.A. 1917F, 367; United Verde Extension Mining Co. v. Koso, 9 Cir., 273 F. 369, 372.

The District Judge declined to instruct the jury as requested by appellant in his Special Request No. 2 dealing with the measure of damages, ruling that the request was covered by the instructions as given. Damages in such a case "should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased," and "that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made upon the basis of their present value only." Chesapeake & O. R. Co. v. Kelly, supra, 241 U.S. 485, at page 489, 491, 36 S.Ct. 630, at page 631, 60 L.Ed. 1117, L.R.A.1917F, 367; Gulf, C. & S. F. Ry. v. Moser, 275 U.S. 133, 48 S.Ct. 49, 72 L.Ed. 200. This general rule was covered by the Court's charge. In addition, the Court charged that in estimating the present cash value of appellee's pecuniary loss, the jury should consider the age of the decedent, his capacity for earning money, his expectancy as shown by the mortality tables and also the expectancy of the widow, and his disposition to contribute to care for and to furnish his wife money. Appellant's Special Request No. 2 asked that the jury be instructed to also consider decedent's health, that all persons do not live to the age of expectancy, that such is particularly true in the case of hazardous occupations, that they may not work during all of the years of their life, that their earnings may not remain stationary and that the reasonably to be expected contributions may vary or diminish in the future, and that the jury should not include any amount as contributions which the children would have received after they attained the age of twenty-one, since it is not presumed that they would received any pecuniary benefits from the deceased thereafter. We think the requested instruction should have been given. Mortality and annuity tables are merely guides to assist the jury in reaching its verdict; they do not furnish rules which the jury is required to follow. The various factors which are present in any particular case making the tables less applicable than they otherwise would be, are also to be considered by the jury. Vicksburg, etc., R. Co. v. Putnam, supra, 118 U.S. 545, 7 S.Ct. 1, 30 L.Ed. 257; Coast S. S. Co. v. Brady, 5 Cir., 8 F.2d 16, 19, 20. The hazardous occupation in which Camp was employed, the possibility of his not working during all the remaining years of his life, the fact that his earning capacity would diminish with increasing age, have a material bearing on the amount of money he reasonably would have made during the remainder of his life and in which the widow and children would share. United Verde Extension Mining Co. v. Koso, supra. Damages recoverable under the Act properly include, in addition to the loss of pecuniary benefits by the widow, the pecuniary value of what the decedent reasonably might have been expected to give his children during their minority. Norfolk & Western R. Co. v. Holbrook, 235 U.S. 625, 629, 35 S.Ct. 143, 59 L.Ed. 392. The recovery is limited to compensating those relatives for whose benefit the administrator sues as are shown to have sustained some pecuniary loss. In the absence of evidence that an adult child is either dependent upon or had any reasonable ground for expecting any pecuniary benefit from a continuance of the decedent's life, a recovery on behalf of such child is excluded. Gulf, Colorado, etc., R. Co. v. McGinnis, 228 U.S. 173, 33 S.Ct. 426, 57 L.Ed. 785; Chicago, B. & Q. R. Co. v. Kelly, 8 Cir., 74 F.2d 80, 85; Nashville, C. & S. & L. Ry. v. Anderson, 134 Tenn. 666, 682, 185 S.W. 677, L.R.A.1918C, 1115, Ann.Cas.1917D, 902. See also Michigan Cent. R. R. v. Vreeland, 227 U.S.

59, 69–72, 33 S.Ct. 192, 57 L.Ed. 417, Ann.Cas.1914C, 176; Chesapeake & O. R. Co. v. Kelly, supra, 241 U.S. 485, 488, 36 S.Ct. 630, 60 L.Ed. 1117, L.R.A.1917F, 367. Appellee contends that the instruction as given did not refer to the children and limited the recovery to contributions to be reasonably expected by the wife. Although the children are not specifically mentioned, the charge refers several times to the pecuniary loss of the "plaintiff." The plaintiff was not the widow individually, but was the widow as Administratrix of her husband's estate. The last paragraph of the complaint seeks recovery for "the other dependants of Ervin Camp." Mrs. Camp testified that Camp turned over to her his entire earnings and that it took all, or practically all, of it to support herself, her husband and the children. The evidence regarding the amount of the annuity was based on the assumption that part of his salary was used for the support of the children. In view of this background, we believe it was prejudicial error not to give the requested instruction. The evidence and the lump sum verdict provide no criterion for segregation of the recovery into different parts which would permit that a remittitur be ordered for the purpose of correcting the error. New York Central & S. & L. R. Co. v. Niebel, 6 Cir., 214 F. 952.

The judgment is reversed and the action remanded to the District Court for a new trial.