Martin R. O'Brien, Administrator of Estate of James A. Doran, Deceased, Appellee, v. Chicago and North Western Railway Company, Appellant.

Gen. No. 10,057.

Opinion filed June 14, 1946.
Rehearing denied October 3, 1946. Released for publication October 3, 1946.

DRENNAN J. SLATER, of Chicago, and CHARLES W. HADLEY, of Wheaton, for appellant.

SEARS, O'BRIEN & STREIT, of Aurora, for appellee; BARNABAS F. SEARS, and WILLIAM C. O'BRIEN, both of Aurora, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the court.

This is an appeal by the defendant Chicago & North Western Railway Company, a corporation, from a $31,700 judgment rendered against it and in favor of the plaintiff, Martin R. O'Brien, administrator of the estate of James A. Doran, deceased, in an action under the Federal Employers Liability Act (45 USCA § 51 *et seq.*), and the Boiler Inspection Act (45 USCA § 22 *et seq.*).

Plaintiff's amended complaint consists of two counts, and advances two theories for recovery of damages on account of the death of James A. Doran, hereinafter known as the deceased, while in the course of his employment as a fireman by the defendant railway corporation.

In the first count plaintiff alleges, in substance, that the defendant railroad was negligent in that it did not furnish deceased with a reasonably safe place to work, and as a result thereof, his health became endangered, and thereby set in motion a sequence of events which resulted in his death.

The second count is predicated solely upon defendant's alleged violations of the provisions of the Safety Appliance Act, of the Boiler Inspection Act, and of Interstate Commerce Commission Rules 116 and 117, which, it is contended, were the proximate cause of the death of the deceased.

Each count contains numerous paragraphs and allegations which cannot be enumerated within the reasonable confines of this opinion, and are not material to a determination of the issues presented on this appeal.

The case was submitted to a jury which rendered a verdict of $31,700 in favor of plaintiff. The court,

after denying defendant's motions to withdraw the case from the jury, for judgment notwithstanding the verdict, for a new trial, and for a remittitur, entered final judgment, from which the defendant now appeals.

Inasmuch as the paramount issue presented on this appeal is whether or not the evidence and legitimate inferences therefrom support the verdict on the questions of negligence, proximate cause, and damages, this court proposes to set forth insofar as possible the uncontroverted material facts as appears from the record.

The Chicago & North Western Railway Company was engaged in interstate commerce, and James A. Doran, the deceased, was employed as a fireman for the said company on January 6, 1942, and had been so employed for close to 23 years.

On the night in question, deceased was the fireman on a 61 car freight train, which was bound in an easterly direction from South Pekin to Proviso, Illinois. At Malta, Illinois, some 50 miles from their destination, it was deceased's duty to fill the water tank of the train. This operation involved the following procedure:

From the huge water tank along the right of way there extends a penstock, or long pipe, which is approximately 10 inches in diameter at the spout. The said penstock must be swung around over the water tank of the train, and placed above the manhole of the tender insofar as possible, so that water may be poured from the tank, through the penstock, into the manhole. The fireman must stand on the deck of the tender near the penstock and turn the wheel on it in order to release the water.

The particular penstock at Malta has been there for over 40 years, and could not be elevated or lowered. There was, moreover, a difference of 2 feet and 4 inches between the mouth of the penstock and the man-

hole, so that as the water poured from the penstock into the tender, it had to flow through space for that 2 feet and 4 inches. There are no lights on the deck of the tender or on the penstock to facilitate accurate pouring. Furthermore, it was admitted that even after the penstock is shut off there are still 30 gallons in the horizontal portion of it which just flow out.

Although defendant's employees refused to say whether water would ever splash on the top of the tender, it was admitted that the action of the wind might deflect the course of the water to a certain extent, and that ice had been seen on the defendant's locomotive in winter. A former fireman testified that in filling the tender from the water tank at Malta, water frequently spilled not only on the tender, but on the control box adjacent thereto, and in the coal bin as well. Moreover, on the night in question it was windy, and the temperature was 17 degrees below zero.

It was admitted by the other two members of the train crew that deceased got his feet wet from the operation at Malta, for when he returned to the cab of the J–4 engine, there was ice on the bottom of his overalls and the top of his shoes, and he appeared to be chilled.

The cab of this particular type of engine is cold due to the fact that the boiler is advanced and the wind keeps the hot air in front of the boiler, and because the apron between the tender and the locomotive fits loosely with canvas curtains as the only protection.

There is, however, a steam heated compartment used to furnish heat and shelter, referred to as the ''dog-house,'' which is located back of the engine and just beyond the coal bin.

Inasmuch as a substantial part of the events surrounding the death of the deceased must be gleaned and surmised from the circumstances, this court deems material the structural relation between the ''dog-

house'' and the other parts of the train. The ''dog-house'' is 4½ feet high, 4½ feet wide, and 3 feet long, and is sunk about 18 inches below the level of the deck of the tender. It is reached by climbing over the coal bin and onto the deck of the water tank, and is entered from an opening in the side of this compartment. There is no passage way, or railing, or hand grip provided along the way from the engine cab to the ''dog-house.'' As one comes out of the ''dog-house'' to return to the engine cab, the top of the coal bin, over which one must climb, is 5 feet over-head. If, however, one goes from the ''dog-house'' up onto the deck of the tender, and from there climbs onto the coal bin, the distance from the deck of the tender to the top of the coal bin is only 3 feet and 8 inches. The foregoing facts have a bearing upon the probable conduct of the deceased, which will be herein-after discussed.

Although one of defendant's employees testified that the ''dog-house'' was for the use of the head brakeman only, the trainmaster admitted that the ''dog-houses'' on these tenders were used by the fire-men. Moreover, it was the only sheltered place on the freight train, other than the caboose which was 61 cars away.

When the deceased returned to the cab of the en-gine after filling the water tank at Malta, he shoveled coal in the engine, and upon completion of this duty he went back to the ''dog-house,'' according to the testimony of the brakeman. His overalls were still wet and he appeared cold. He left his heavy overcoat, however, in the cab of the engine where he had placed it at the beginning of the run.

There is some conflict in the evidence as to whether or not deceased was told by his superior, the engineer Chapman, to go back to the ''dog-house'' and get warm. Deceased's wife testified in rebuttal that the engineer had told her the day after the inquest that

he had told the deceased to go back and get warm or else he would be sick, and that was the last he saw of him. This statement was denied.

On behalf of defendant it was claimed that by going to the ''dog-house'' deceased violated two company rules and a company bulletin requiring employees to remain at their posts, and forbidding anyone except the engine crew from entering the coal pit of the locomotive.

In any event, after deceased left to go to the ''dog-house'' he was not seen again until about 6:30 a. m. the next morning when his body was found frozen between the rails of the tracks about 25 feet east of the overhead viaduct near Proviso. He had a compound skull fracture, and one arm was severed and was lying on the rails. From all indications death was apparently instantaneous.

There were no eyewitnesses to what transpired after deceased left the cab of the engine and the sequence of events can only be surmised from the circumstances. At the time deceased left to go back to the ''dog-house'' the train was about 2 to 3 hours behind time and was traveling between 40 to 45 miles per hour. There was no stop scheduled until the final destination was reached. About 6¾ miles from the yards at Proviso there is a viaduct which is 7 feet 1½ inches above the tender deck, and 3 feet 5 inches above the top of the ''dog-house'' and the coal bin. Approximately 305 feet west of this viaduct are telltales—wires suspended on a cable hanging down perpendicular over the tracks, the bottom of which are only five feet 6¼ inches above the deck of the tender.

Another relevant circumstance is that the suit box containing deceased's civilian clothes which had been placed in the ''dog-house'' at the beginning of the run was found two days after the occurrence by a fireman, in the coal bin where it was interfering with the feeding of the coal.

The deceased was 47 years of age, in good health, and had been classified for his promotion to the grade of engineer. He left surviving a widow, and 3 children, Jack, 23; Jeanne, 20; and Marjorie, 17. His earnings for the preceding year were $2,600, or $216.70 per month, and his entire income went to his family except his necessary traveling expenses. Jeanne, the older girl, was and is working, Marjorie, a minor, had left high school to go into nurses training, but claimed that she had to go to work when her father died. Jack had a medical discharge from the army for wounds received in combat and is presently taking the shorter of two courses available to him under government provisions. The widow is now working as a saleslady, earning $24 per week at Sears, Roebuck & Company.

On the basis of the foregoing facts and circumstances the jury entered a verdict of $31,700 in favor of the plaintiff and the court entered judgment thereon.

The principal errors relied upon by defendant for reversal of the judgment are: that the trial court denied defendant's motions to withdraw the case from the jury, for judgment notwithstanding the verdict, and for a new trial; that the evidence does not tend to support the cause of action; that the court erroneously admitted in evidence a photograph marked plaintiff's exhibit 1; and that the court gave the jury certain objectionable instructions; that the verdict and judgment are grossly excessive; and that plaintiff's attorney committed prejudicial error in his argument to the jury.

■ ■ It is an established principle of law that where there are controverted issues of fact presented by the evidence upon which reasonable men may disagree, that the court must submit the case to the jury, *Devine v. Delano*, 272 Ill. 166, 179–182; *Bailey v. Central Vermont Ry. Co.*, 319 U. S. 350, 354, 87 L. Ed.

1444, 63 Sup. Ct. 1062, and the verdict of the jury may not be set aside unless it is manifestly against the weight of the evidence. Therefore, this court will determine it, under these established principles, the trial court erred in denying defendant's motions.

Plaintiff has in the instant case relied upon two theories for recovery. The first count of the complaint is predicated upon the provisions of the Federal Employers Liability Act. The relevant terms and provisions of sec. 1 of the Act (45 USCA § 51) are as follows:

"Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment."

This court is cognizant of the liberalizing tendency of the courts and the legislature evident in the recent decisions and in the abolition of the doctrine of assumption of risk by the provisions of the 1939 amendment.

More particularly we refer to the case of *Lavender v. Kurn,* 66 Sup. Ct. 740, decided in March 1946, where the United States Supreme Court reversed the Missouri Supreme Court in a case arising under the Federal Employers Liability Act and held the defendant railroad company liable where there was a scintilla of evidence from which it could be inferred that the end of a mail hook on one of the trains struck

the switchman. The court stated at p. 744: "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Nevertheless, under this statute it is still incumbent upon plaintiff to prove that the defendant was negligent and that such negligence was the proximate cause in whole or in part of the injury or death. *Tennant v. Peoria & P. U. R. Co.*, 321 U. S. 29, 88 L. Ed. 520, 32, 64 Sup. Ct. 409, 411 (1944).

In the case at bar, plaintiff contends that defendant's negligence in not furnishing deceased with a reasonably safe place to work endangered deceased's health, and that as a natural and probable result of that negligence, and with or without consent of his superior, deceased endeavored to protect his health by seeking refuge in the only place of heat and shelter accessible to him. It is further contended that, while returning to his post of duty the deceased accidently fell or was knocked off the train, and that defendant, by the exercise of ordinary care might reasonably have foreseen that some injury might have resulted from his original negligence.

In support of the foregoing theory of liability, plaintiff has adduced evidence to show that the facilities deceased was required to employ in the performance of his duties as fireman endangered his health. He had to stand beside the manhole on the deck of the tender and turn the wheel of a 40 year old penstock which could not be elevated or lowered, while water flowed from the spout of the penstock into the manhole. Neither the deck of the tender nor the penstock was lighted, and the water had to flow through 2 feet of space on a windy night when the temperature was 17 degrees below zero. Moreover, it was admitted by defendant's employees that after deceased filled the water tank at Malta he was wet, that the bottom of his overalls and the top of his shoes were covered with ice, and that he was cold and chilled.

The engine cab was cold and there was no place of heat or shelter available to the deceased except the "dog-house," and to reach it necessitated going over the coal bin, without a railing or hand grip, while the train was in motion. This hazard was known to the defendant which allegedly had issued a bulletin forbidding persons other than members of the engine crew from going on the coal pile. The deceased, however, was a member of the engine crew and some of his duties required him to be on the coal bin. Moreover, if the credibility of the witness, Chapman, is to be weighed, it appears that deceased went to this "dog-house" with the consent, and at the suggestion of his superior who stated that he better go back and get warm and dry, or else he would be sick.

Irrespective of this consent, however, it is apparent that it was essential for the preservation of the health of the deceased that he go to the only available place of heat and shelter over this known hazardous route.

The court rejects as untenable defendant's contention that the issue of whether or not the facilities furnished by the defendant constituted negligence, should not have been submitted to the jury, inasmuch as it was an engineering question, solely within the jurisdiction of the Interstate Commerce Commission.

The Supreme Court in *Bailey v. Central Vermont Ry. Co.*, 319 U. S. 350, 353, 87 L. Ed. 1444, 63 Sup. Ct. 1062, stated:

"The debatable quality of that issue, (whether the facilities furnished by the employer constituted negligence) the fact that fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury. The jury is the tribunal under our legal system to decide that type of issue. (Citations) To withdraw such a question from the jury is to usurp its function."

In *Lilly v. Grand Trunk Western R. Co.*, 317 U. S. 481, 489, 87 L. Ed. 411, 63 Sup. Ct. 347, 352, the Su-

preme Court specifically stated that the jury could have found negligence from the facts in that case regardless of whether or not there was a specific rule of the I. C. C. governing the question.

It is clear to this court that the jury might have reasonably concluded from the evidence presented that the health of the deceased was endangered by performing his duties under these circumstances and with the available facilities, and, therefore, that the defendant was negligent under the terms of the Federal Employers Liability Act.

It was incumbent upon plaintiff thereupon to establish a causal connection between defendant's negligence and the ensuing death of the deceased in order to impose liability upon defendant under the Federal Employers Liability Act.

On the issue of proximate cause the evidence is admittedly circumstantial, for no one saw deceased after he left for the "dog-house." It is plaintiff's theory that the deceased went to the "dog-house," and on his way back to the cab where he had to perform further duties, he was knocked off by the viaduct or fell from the train.

To substantiate this theory plaintiff relies upon the following known facts: Deceased left for the "dog-house" 30 miles before the train passed the place where his body was found; the engineer told him to go back and get warm, and the only place to do so, other than the caboose, was the "dog-house." Furthermore, the deceased had placed his suit box in the "dog-house" when the run was started at Pekin, he didn't have it with him when he left the cab. to go to the "dog-house," yet it was found two days later in the coalbin of this same locomotive, thereby indicating that he did go to the "dog-house," remove the suit box, and was apparently on his way back when the accident occurred.

His intention to return to his post is further evident from the fact that he had left his heavy overcoat in the cab of the engine when he left to go to the "dog-house."

That deceased was knocked down by the viaduct is deduced from the fact that the viaduct through which the train passed is only 3 feet 5¼ inches above the coalbin over which deceased had to climb on his way back to the cab, and deceased's body was found 25 to 30 feet east of this overhead viaduct. Furthermore, the train was 2 to 3 hours late and was thundering downgrade between 40 to 45 miles per hour about the time it passed beneath the viaduct.

Defendant, however, contends that the known facts lend credence to another theory, i. e., that deceased brought the accident upon himself; that when he left the "dog-house" with the suit box he intended to go down from the tender to be in position to drop off at Elmhurst to make train connections for his home, and that he slipped off the train.

From the foregoing theorizing defendant argues that inasmuch as the circumstances admit two inconsistent interpretations it cannot be contended that the plaintiff has established a causal connection between the alleged negligence and the death of the deceased by circumstantial evidence so as to warrant submitting this issue to a jury.

In support thereof defendant has cited numerous cases enunciating the principles relating to circumstantial evidence. To discuss and distinguish these cases would not be feasible within this opinion, and would serve no useful purpose. This court is satisfied, however, that the prevailing rule with reference to circumstantial evidence has been stated lucidly and scholarly by the Supreme Court in *Tennant v. Peoria & P. U. R. Co.*, 321 U. S. 29, 88 L. Ed. 520, 64 Sup. Ct. 409. At page 35 the Court stated:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. . . . The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. . . . That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. . . ."

This theory offered by defendant is, moreover, inconsistent with the fact that deceased's overcoat was left in the engine cab where he had placed it at the outset of the trip, and it seems illogical that on a windy night, when the temperature was 17 degrees below zero, that a reasonable man would deliberately plan to leave for home without his overcoat. Furthermore, the record shows that the deceased had never before left the train before completing his duties.

In the *Tennant* case, *supra,* the court stated:

". . . These and other possibilities suggested by diligent counsel for respondent all suffer from the same lack of direct proof as characterizes the one adopted by the jury. But to the extent that they involve a disobedience of duty by Tennant no presumption in their favor exists. . . ."

Nor can this court approve defendant's contention that deceased's conduct in going to the "dog-house" and attempting to return therefrom constituted an intervening cause unforseeable by defendant, which destroyed the chain of causation.

The requirements for a negligent act to be the proximate cause of an injury have been exhaustively examined by the Supreme Court of Illinois in *Illinois Cent. R. Co. v. Siler,* 229 Ill. 390, 394:

"In order to make a negligent act the proximate cause of an injury, it is not necessary that the particular injury, and the particular manner of its occurrence, could reasonably have been foreseen. (*City of Dixon v. Scott,* 181 Ill. 161.) If the consequences follow in unbroken sequence from the wrong to the injury without an intervening efficient cause, it is sufficient, if at the time of the negligence, the wrongdoer might, by the exercise of ordinary care, have foreseen that some injury might result from his negligence. (Citation.)"

In the instant case it is clearly forseeable that where an employee is required to perform duties which inevitably involve his getting splashed with water on a bitterly cold day, that his health would be endangered and he would go to the nearest place of heat and shelter and return thereafter to his place of duty. But for the original negligence of defendant in not furnishing adequate facilities for the deceased he would not have become wet, and it would not have been necessary or likely for him to undertake the hazardous journey to and from the "dog-house," over the coalbin, nor would he have come to his death while in the act of returning to his post.

In *Phillabaum v. Lake Erie & W. R. Co.,* 315 Ill. 131, the issue of intervening cause was discussed by the Illinois Supreme Court. In that case the carrier failed to equip his cars with couplers which would couple on impact, and the plaintiff, a switchman, went between the two cars to effect a couple by hand. While between them the engineer moved the cars, catching plaintiff between the couplers and crushing his right foot. The defense was that plaintiff's going between the cars was an independent intervening act, breaking the chain of causation, just as it is argued here that deceased should have stayed in the "dog-house," and that his attempted return to his post of duty was likewise an intervening act.

The court stated that proximate cause was a jury issue, and that, "In choosing the course of action he

did, plaintiff in error selected one of several courses left open to him and to which he was driven by the fault of defendant in error in failing to properly equip its cars.''

It is the considered judgment of this court in the instant case that the evidence and reasonable inferences therefrom clearly support the verdict and the imposition of liability under the allegations of the first count of plaintiff's complaint.

Inasmuch as defendant submitted no specific interrogatories nor asked for a special finding it is not clear upon which count the jury predicated the verdict, and this court will therefore consider the second count of plaintiff's complaint and the evidence in support thereof.

Under count two of the complaint plaintiff realleges that defendant furnished the deceased with inadequate facilities, and asserts that this constituted a violation of the provisions of the Boiler Inspection Act. As a result of this statutory violation the deceased slipped on the ice on the deck of the tender and fell to his death, and therefore liability should be imposed upon defendant.

In support of this theory of liability plaintiff relies upon the case of *Lilly v. Grand Trunk Western R. Co.*, 317 U. S. 481, 87 L. Ed. 411, 63 Sup. Ct. 347, where the plaintiff fireman fell from the top of a locomotive tender while he was putting a waterspout over the tender's manhole, preparatory to filling the tank with water. Mr. Justice MURPHY, speaking for a unanimous court stated at page 486: ''The use of a tender, upon whose top an employee must go in the course of his duties, which is covered with ice seems to us to involve 'unnecessary peril to life or limb'—enough so as to permit a jury to find that the Boiler Inspection Act has been violated.''

In denying liability under this count defendant argues that the *Lilly* case, *supra,* is clearly distinguishable on the ground that there it was established

that the fireman had been standing on the ice which had formed on the tender, whereas in the instant case it must be presumed first that water got on the deck of the tender, that ice formed therefrom, and that the deceased slipped on this ice and fell. Defendant insists that the law does not permit presumptions to be pyramided.

Presumptions are indulged in only in the absence of evidence. The known facts and circumstances herein indicate that the water pouring from the penstock at Malta into the manhole of the tender had to pass through two feet of space, and that on a windy day it is hardly possible to fill the tank at Malta without getting water on the deck of the tender, and "sometimes a little gust of wind will move the penstock and you are in for a drowning." Moreover, on the night of January 6 there was a high wind, and the temperature was 17 degrees below zero.

This court is satisfied that under those circumstances the existence of ice on the deck of the tender can be regarded as an established fact. It is likely, furthermore, that the deceased did pass on this ice, inasmuch as the wind was from the northeast and would blow the water, which at that temperature would form into ice, toward that portion of the tender deck over which the deceased would naturally pass when coming out of the "dog-house" on his return to the cab of the engine.

Whether or not the deceased slipped on this ice, or was knocked off by the viaduct is not clear from the evidence, for the circumstances support both inferences. In support of the theory advanced in count 2, i. e., that deceased slipped on the ice on the deck of the tender, there are the following known facts: Deceased was an experienced fireman and had been over this run many times, and therefore knew of the viaduct; that the said viaduct could be plainly seen and that there were the tell-tales warning of its approach;

that the deceased had but one injury—the skull fracture—which was likely to be caused from a fall, whereas if he had hit the viaduct it is likely that he would have had two serious injuries, one from the viaduct and one from the fall.

From the foregoing facts and circumstances the jury could reasonably have predicated liability under the second count of the complaint as well as the first count. As hereinbefore stated, it is not the province of this court to reweigh the evidence and set aside the verdict of the jury, for the right to trial by jury is "part and parcel of the remedy afforded railroad workers under the Employers Liability Act. . . . To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them." *Bailey v. Central Vermont Ry. Co.*, 319 U. S. 350, 354, 87 L. Ed. 1444, 63 Sup. Ct. 1062, 1064.

It is, therefore, the opinion of this court that the trial court did not err in denying defendant's motions for a directed verdict, and for judgment notwithstanding the verdict.

With reference to the alleged errors of the trial court in giving the instructions offered by plaintiff, this court holds that none of these instructions constituted reversible error.

Instruction 6, which instructs the jury to disregard the testimony of a witness who has falsely testified on a material issue, is accompanied by instructions which apprise the jury of the material issues and therefore complies with the requirements for such instructions set forth in *Kavanaugh v. Washburn*, 320 Ill. App. 250, and *People v. Wells*, 380 Ill. 347.

Instruction 12, which set forth the rule that plaintiff is not required to prove what deceased was doing at the instant of the injury, and that the law requires only the highest proof of which the case was suscepti-

ble, is objected to because it limited the jury's consideration to the instant of injury in determining whether there was contributory negligence. Clearly this is a strained interpretation of the words and intended meaning of this instruction, which merely enunciates a rule of law obtaining since 1871. *Chicago, B. & Q. R. Co. v. Gregory,* 58 Ill. 272, 278.

Instruction 14, which states the rule pertaining to facts established by circumstantial evidence was approved by the Illinois Supreme Court in *North Chicago St. R. Co. v. Rodert,* 203 Ill. 413–415, where similar arguments as those urged by defendant were levelled against it and overruled by the court.

Instruction 15, the summarizing instruction, is objected to in the main because, it is contended, there is no evidence to support some of the charges in the complaint. This contention was expressly rejected by the Illinois Supreme Court in *Schlauder v. Chicago & Southern Traction Co.,* 253 Ill. 154, 162.

Instruction 16 recited the provisions of the Federal Employers Liability Act, and it has been held that instructions in the law are permissible where, as in the instant case, they are accompanied by further instructions advising the jury of what plaintiff had to prove. *Trust Co. of Chicago v. Ancateau,* 317 Ill. App. 186, 198.

Instruction 17 recited the relevant provisions of the Boiler Inspection Act, and of Rule 153 of the I. C. C. pertaining to keeping the top of the tender free from foreign matter, including ice. This instruction is objected to on the ground that it invaded the province of the jury by stating that ice on the tender was a violation of the statute. Inasmuch as the instruction merely informed the jury what the law was under the interpretations of the statutes by the Supreme Court in *Lilly v. Grand Trunk Western R. Co.,* 317 U. S. 481, 87 L. Ed. 411, 486, 63 Sup. Ct. 347, 351, it was proper and did not constitute reversible error.

 Nor did the trial court err in admitting the plaintiff's exhibit 1, which was a picture of the defendant's employees in the course of their employment, revealing how the water flowed through the penstock into the tender of a locomotive. This exhibit came within the rule of *Connors v. Winke*, 200 Ill. App. 351, that photographs may be admissible, not as evidence within themselves, but for the purpose of enabling the jury to understand and apply the testimony.

Defendant's contention that the argument to the jury by plaintiff's counsel was inflammatory and prejudicial, and therefore warranted a new trial, is without merit. There is no showing that counsel persisted in any objectionable tactics. In fact, only one objection was made to his entire closing argument, and the jury was instructed to disregard that remark, which in terms was clearly distinguishable from the type of comments condemned by the court in the cases cited by the defendant.

 In conclusion, it is the opinion of this court that the verdict submitted by the jury is not excessive, and, hence, is neither grounds for a new trial, nor warrants the issuance of a remittitur. The evidence on this issue reveals that the deceased was only 47 years of age and in good health. His average earnings as a fireman for the preceding year had been over $2,600, or $216.70 per month. Of this sum, he gave all of his earnings to his wife for the support of his family, consisting of three children, except such sums as were necessary for his travel expense. In passing upon the propriety of the amount of damages awarded, this court takes judicial notice of the rise in the cost of living through the war years, the reduction in the purchasing power of money, and the excellent prospects for increased earnings by the deceased at the time of his death, in view of the fact that he had already been classified as an engineer by the defendant company.

The parties have argued at length and have ably presented in this appeal the facts and inferences therefrom, and the applicable statutes and decisions. It is the decision of this court that no error was committed by the trial court, and that the judgment entered therein should be affirmed.

*Judgment affirmed.*