Peter M. Johnson, by Essie Williams, Next Friend, Appellee, v. Elgin, Joliet and Eastern Railway Company, Appellant.

Gen. No. 10,211.

318

Opinion filed November 12, 1948.
Opinion slightly modified and petition for rehearing denied September 6, 1949. Released for publication September 6, 1949.

KNAPP, CUSHING, HERSHBERGER and STEVENSON, of Chicago, and HALL, MEYER & CAREY, of Waukegan, for appellant; HARLAN L. HACKBERT, of Chicago, and WESLEY G. CAREY, of Waukegan, of counsel.

JOSEPH KAUFER, of Waukegan, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

This is an action at law under the Federal Employers' Liability Act to recover damages for injuries sustained by the plaintiff, a hostler's helper at defendant's roundhouse at Waukegan, Illinois. The complaint consisted of two counts and as amended alleged, among other things, that on March 7, 1945, plaintiff was employed by the defendant and on this date was engaged in filling the water tank of a locomotive tender and while so engaged was required to stand and walk about and on the top of said tender

which was unsafe and in an improper condition in that the top where plaintiff was required to work was slippery and covered with snow, ice and water and other substances; that as a direct result of said unsafe and improper condition plaintiff slipped and fell over the edge of the tender and upon the ground and as a result thereof suffered the injuries to recover for which this suit is brought. After the issues had been made up there was a trial before the court and jury resulting in a verdict for the plaintiff for $8,000. Upon this verdict judgment was rendered and the defendant brings the record to this court for review.

During the pendency of this appeal the plaintiff, Peter M. Johnson, died and his administratrix has been substituted as plaintiff. The evidence discloses that Peter M. Johnson was a colored man, about fifty-eight years of age at the time of the accident. He had worked for the Chicago & Northwestern Railroad at its roundhouse in Waukegan for fifteen years and for eight years prior to the time he was injured had been employed by the defendant as a hostler's helper at its roundhouse in Waukegan.

Armas Balberg was the hostler employed by defendant and his duties were to operate the engines in and out of the roundhouse. The duties of Johnson, his helper, were to put water, sand and coal in the engine, to clean the fire and prepare it for service. On March 7, 1945 about 7:30 in the evening Armas Balberg took this particular switch engine out of the roundhouse and moved it to the pen stock or water spout preparatory to filling the five thousand gallon tank with water. Johnson was on the ground and swung the water spout over the tender by means of a lever at the base of the pen stock. Johnson then climbed the steps on the back of the tender to the top and lowered the mouth of the spout into the oval manhole of the tank and turned the water on. Johnson testified that it takes forty-five or fifty minutes to fill

the tank, that he had been on top of the tender about ten minutes and did not see any snow or ice on the tender but saw some water, that the sides of the coal bin rise above the top of the tender, that after he turned the water on he faced south with his back toward the cab of the engine and his right foot was on the west between the manhole and coal bin and his left foot east of the manhole on the east edge of the top of the tender. He continued: "I couldn't quite see. There was no light over me where I was working. There was a light to the north about the length of an engine and a light to the west about the same distance. I couldn't see so good and then I slipped on a piece of ice and went down. I tried to grab something. There was nothing to grab, no hand rail, I felt my foot slip on the ice. I remember hitting the ground. I was wearing high top boots with rubber soles."

Mr. Balberg testified that after Johnson turned the water on he, Johnson, went to the front edge of the top of the tender, secured a shovel and Balberg heard him shoveling coal in the coal bin and a moment or two later saw him falling through the air on the right side of the tender. As a result of the fall Johnson was rendered unconscious and was immediately taken to Victory Memorial Hospital in Waukegan where it was found that he had fractured both wrists and suffered extensive and severe injuries. The left upper eyelid was paralyzed and there was a paralysis of the movement of the eyeball. He did not regain consciousness for several days and Dr. Barnes who attended him at the hospital testified that his final diagnosis, as recorded by the hospital history was that Johnson suffered a "fracture of both wrists, cerebral concussion, possible basal skull fracture, with injury to the left oculomotor nerves." It was the doctor's opinion, however, that Johnson did not have a cerebral hemorrhage and upon his discharge from the hospital on April 23, 1945, the doctor's testimony was that his

notes disclose that Johnson ''appeared to be oriented, comfortable and happy and aside from the oculomotor paralysis he appeared to be alright. He was eating well, walking around the corridors and feeling well.''

After leaving the hospital Johnson went to the home where he had been living at the time of the accident. He was unable to work. Upon one occasion before he left the hospital he was visited by H. E. Pasold, division claim agent for the defendant. After Johnson left the hospital Pasold called upon him at his home on three or four occasions prior to November 5, 1945. On November 5, 1945, Pasold called and, according to Pasold's testimony, told Johnson and Hannah Gibbs, Johnson's housekeeper, whom Pasold assumed to be Johnson's wife, that he wanted to talk to them about making a final settlement for the injuries which Johnson sustained on March 7, 1945, that he told them Johnson had been on their compensation pay roll for approximately eight months, that we had paid him $600 and that he would offer him $1,000 in addition to the $600 he had already received as a final settlement. This witness continued: ''I explained to him that I based that on the fact that he had been off for eight months and his wages were approximately $200 per month, so by giving him $1,000 in addition to the $600 I was really reimbursing him for the time he would have lost during those eight months——I asked Johnson if he thought I was fair; that I wanted to treat him right and I thought that was a fair figure and personally I couldn't raise it. I told them there was no rush but to think it over and if they wanted to take care of it today they could, that I had brought a draft with me but it was up to them. They didn't say anything; just looked at each other and listened. I told them I had been giving it considerable thought. Pete said he thought that was very fair and Hannah said, 'Yes, Pete has always said that if everybody was as nice to us as you have been, we wouldn't have anything to complain about.' I then told him if he wanted

this thousand dollars he would have to sign a release in settlement for his claim; that it would be necessary for him to go down to the yard master's office because I would have to use a typewriter to make several copies of the release and he said that was perfectly alright, he would go. I asked Hannah if she would go and she said she would have to bring the children. After we had agreed on the settlement he said: 'What about going back to work?' And I said I knew of a job that I thought he could handle and I thought he could have it. I said the job wasn't part of the settlement but there was a janitor's job and I said it was paying approximately what he was getting previously but it was only a six day job instead of seven. Hannah said that was alright and I said after signing the release you can talk to Mr. Cooper who has charge of that job and that a nice feature about the job was that there was no bumping, that if he could do the work satisfactorily, there was no question of losing it.''

The Mr. Cooper referred to was Alfred Cooper, general yard master of the defendant. He drove Mr. Pasold to the Johnson home on November 5, 1945 and remained in the car. When Pasold, Johnson, Hannah Gibbs and the two children came out of the house and got in his car he drove them to his office. When they arrived there Pasold, Johnson and Cooper left Hannah and the children in the car while they went into Cooper's office. Cooper returned to the car immediately and remained with Hannah and the children. Pasold prepared a check for $1,000 and the following release in triplicate, which was shortly thereafter signed by Peter M. Johnson, Hannah Gibbs and H. E. Pasold who also signed the name of O. F. Gnadinger thereto.

''SETTLEMENT FOR INJURIES

Do Not Sign Without Understanding.

Elgin, Joliet and Eastern Railway Company hereby agrees to pay to Peter M. Johnson, employed as a

Roundhouse Laborer on the 7th day of March A. D., 1945 the sum of One Thousand and no/100 Dollars, and said Peter M. Johnson in consideration thereof does hereby release and discharge said Company —— from all claims and demands which he has against said Company —— on account of all injuries received by him in any accident or accidents which may have happened before the signing of this contract of settlement, and also especially on account of all injuries received by him in an accident which happened on or about the 7th day of March A.D. 1945 at or near Waukegan, Illinois and which resulted in injuries to him and whether or not such injuries or their extent are known to him.

This contract of settlement contains all the agreements between the parties.

Said Peter M. Johnson acknowledges that said sum of One Thousand and no/100 Dollars ($1000.00) has been paid to him.

Signed and sealed at Waukegan, Illinois, this 5th day of November A.D. 1945.

ELGIN, JOLIET AND EASTERN RAILWAY COMPANY

By O. F. Gnadinger    (Seal)
Peter M. Johnson    (Seal)

The above statement was read in the English language by the said Peter M. Johnson in our presence at Waukegan, Ill., on the 5th day of November A.D. 1945, and the said Peter M. Johnson then said in the English language that he knew it was a full settlement of all claims against the Company, and he signed it before us.

Hannah Johnson
Address 627 Kennard, Waukegan
H. E. Pasold
Address Joliet, Ill."

After the foregoing release was prepared Pasold asked Hannah to come into the office and this is his account of what occurred: "There were just three of us, Pete, Hannah and myself. I handed the original

to Mr. Johnson and a copy to Hannah and the other copy was on the desk. I asked Pete to read it aloud and he put on a pair of glasses smaller than the ones he is wearing today with metal rims which were slightly crooked. He read the release out loud to me, after which I asked Hannah to read the release out loud and she did. I showed Pete where he could sign his name if he understood that this was a final release and this was absolutely all the money he was going to get on account of injuries he sustained on March 7, 1945 and he said he understood that and he signed his name as Peter M. Johnson. After he finished signing the three releases, Hannah signed her name as a witness and I signed as a witness——. After they signed the release I handed the check to Pete and he read it and looked at it and handed it to Hannah. The words on the draft 'in full settlement for personal injuries as per release' were on the document when I gave it to Mr. Johnson and after I gave him the draft I told him he could go talk to Mr. Cooper about the job if he wished. We all got in the car and while driving to their home Mr. Cooper talked to Pete about this job and asked him when he wanted to come to work and he said Monday.'' Other than admitting that the signatures upon the release are their genuine signatures and that Pasold came to the Johnson home on November 5, 1945 and they accompanied Mr. Cooper and Pasold to Mr. Cooper's office that day and that Johnson received a $1,000 check from Pasold, almost every thing else testified to by Pasold was in conflict with the version of what transpired upon this occasion, as testified to by Johnson and Hannah L. Gibbs.

According to the testimony of Johnson and Hannah Gibbs, the release was signed but not in the presence of Hannah, that after Johnson had signed it Hannah came into Cooper's office from the car and she signed it. Johnson testified that no one told him that the instrument he signed was a settlement, that at his home on the

morning of November 5, 1945 no mention was made of any settlement or the payment to him of $1,000; that no one ever read the release to him, that he never understood it, that all that was on his mind was a job and he signed for a job, that while he could read he had no glasses at Mr. Cooper's office and never read the instrument he signed. Hannah Gibbs testified that when Mr. Pasold first came to her house after the accident he inquired of her whether she was Mrs. Johnson and she told him she was, that the reason she did so was because after Johnson returned to his home from the hospital he, Johnson, told everybody that Hannah was his wife, that her husband died in 1939 and Johnson's wife, who was her sister, died in 1942, that in 1943 Johnson moved in the home where Mrs. Gibbs and her two grandchildren were living. Mrs. Gibbs testified she did not read the instruments which she signed and no one read them to her, that nothing was said by any one in her presence at any time about a settlement or about a payment to Johnson of $1,000 but that after they left Cooper's office and came to the car one of the gentlemen asked Johnson if he had his check and he said he did, that after they arrived home Johnson told her he had a check for $1,000 and she saw it and knew it was check for $1,000 and she knew he took it to the bank later. According to Johnson the party representing the defendant, who came to his home on November 5, 1945 asked him how he was getting along and he replied that he was feeling pretty good. As abstracted, this is what then ensued: " 'You seem to get better. Can you work?' I said 'Yes, I can work; that is what I want to do—work.' He said 'Now you take your time and I sign you for another job; a better job than you had.' And I said 'alright.' He had a car to take me down to Cooper's office. That is why they signed me up there. I signed a paper there. That is my signature (on the release). I am wearing glasses now. At the time I signed that paper I didn't have any glasses.

They never told me what the paper was for. They told me they had a paper for me to sign, did I want another job. That is what was in my mind before. That is what they told me. They said the paper was to get another job, they didn't tell me the paper was a settlement. I ain't hear tell of no settlement. They didn't tell me this paper was a release for injuries. They said the check was for my benefit and so on for my indebtedness. I did not read the check over at any time before I signed it. They did not tell me the check was for a settlement; he never said settlement. You have to sign up for jobs on the E. J. and E. at the big office. They gave me a job. After I signed up I came to work the next morning. The first time I found out I signed a release——was in August 1946."

The evidence is further that the day after he received the $1,000 check he returned to work for the defendant as a janitor, performed his work satisfactorily for a couple of months but was discharged on August 8, 1946 for failure to render acceptable service. On November 11, 1946, Johnson was found to be of unsound mind at that time and in the opinion of the qualified and competent Neurologist and Psychiatrist who examined him on that day he was of unsound mind on November 5, 1945 and not of sound mind any time during that month. A further examination of Johnson on April 7, 1947 confirmed these conclusions and that his condition was permanent. There was other evidence to the effect that after the accident Johnson thought Hannah Gibbs was his wife and that a deceased son was still living, that he mumbled, was forgetful, not neat and clean in the care of his person as he had been before the accident and his stepfather was of the opinion he had not been of sound mind since the accident. There is other evidence to the effect that Johnson had always enjoyed good health and had had no dizzy or fainting spells prior to the accident and he denied that on the night of the accident he became

dizzy and fell. On behalf of the defendant Mr. Pasold testified that at the time the release was executed Johnson, in his opinion, was of sound mind and Dr. John Martin a qualified and competent specialist in neurological surgery, in answer to a hypothetical question, stated, that in his opinion, there was no connection between the accident in March 1945 and the described mental condition found at the time of the psychiatric examination in November 1946. It was also the opinion of this witness that a cerebral hemorrhage preceded Johnson's fall from the tender in March 1945.

It is first insisted by counsel for appellant that there is no proof of any intent upon the part of any representative of the defendant to defraud Johnson nor any proof of any misrepresentation made to him at the time the release was executed and he accepted defendant's check reciting that it was in full satisfaction of his claim and therefore the trial court erred in denying appellant's motion for judgment notwithstanding the verdict. In support of this contention counsel cite *Hartley v. Chicago & A. R. Co.,* 214 Ill. 78; *Pawnee Coal Co. v. Royce,* 184 Ill. 402 and *Woodbury v. United States Casualty Co.,* 284 Ill. 227. What these cases hold is that if a release, such as the one involved in this proceeding, is fairly entered into, it would constitute a complete bar to this cause of action. In *Pawnee Coal Co. v. Royce,* 184 Ill. 402, the court (p. 412) quoted from *Chicago, R. I. & P. Ry. Co. v. Lewis,* 109 Ill. 120 as follows, *viz:* "It may be safely stated as undeniable law, if the release was obtained by fraud, at a time when plaintiff was incapacitated to contract, it was absolutely void from the beginning as between the parties, and will stand in the way of the assertion of no right by the party defrauded. On principle, an instrument absolutely void needs not to be rescinded to remove it out of the way of the assertion of a right. It is for the obvious reason it never had any binding force, and there was therefore nothing to rescind. A

contract void on account of fraud, or for any other reason, is, in law, as though it had never been executed.''

There is evidence in this record to the effect that Johnson did not know until August 1946 that the instrument he signed on November 5, 1945 was a release and there is evidence that he was told at the time he signed the release that the paper he signed, which later proved to be a release, was for the purpose of getting him another job. The rule, as stated in the *Royce* case, *supra,* is that in all cases where a release has been executed and its effect is sought to be avoided, the circumstances of its execution and whether there is sufficient cause to avoid it, as well as whether a return of the consideration must be had, are questions of fact to be found by the jury under proper instructions. If Johnson fully understood the character of the instrument he executed on November 5, 1945 and knew he was signing a release of all his claims or demands against the defendant and knowingly received and accepted the consideration therefor, then the effect of such an instrument can only be avoided by a separate proceeding in equity. If, however, Johnson did not know the character of the instrument he signed (and he testified he did not) and if he was made to believe that he was simply signing an application for a job (and he testified he was) then the fraud of the company consisted in its representatives stating that the paper he signed was to get another job and in not advising him of the character of the instrument itself. The misrepresentation was as to the character of the instrument and under the authorities if this is what took place when the instrument was signed, it was not fairly obtained and did not operate to release the damages sued for. *Papke v. G. H. Hammond Co.,* 192 Ill. 631; *Chicago City Ry. Co. v. Uhter,* 212 Ill. 174; *Chicago, R. I. & P. Ry. Co. v. Lewis,* 109 Ill. 120; *Reitz v. Yellow Cab Co.,* 248 Ill. App. 287; *Eagle Packet Co. v.*

*Defries*, 94 Ill. 598. Under the evidence found in this record it would have been error for the trial court not to have submitted these questions of fact to the jury. *Chicago City Ry. Co. v. McClain*, 211 Ill. 589; *Chicago City Ry. Co. v. Uhter*, 212 Ill. 174; *Indiana, D. & W. Ry. Co. v. Fowler*, 201 Ill. 152.

It is also insisted that the acceptance and retention by Johnson of the check for $1,000 and the proceeds thereof bars this action in the absence of the return or offer to return the $1,000 received by Johnson. In our opinion sec. 55 of the Federal Employers Liability Act (45 USCA § 55) does not require a tender back of the consideration paid as a condition precedent to maintaining an action for injury. That section does provide that the carrier may set off any indemnity that may have been paid to the injured employee. (*Callen v. Pennsylvania R. Co.*, 162 F. (2d) 832, affirmed in 332 U. S. 625, 68 Sup. Ct. 296.) In the instant case, however, appellant did not seek so to do but, by its pleadings, urged that the release was a complete bar to any recovery, and upon the trial that question was submitted to the jury under proper instructions. The law is well settled in this State that if Johnson executed this release with knowledge of its meaning, it would bar a recovery but whether or not Johnson signed this release with knowledge of its meaning was a question of fact for the jury. The jury under proper instructions of the court, found for the plaintiff upon that issue and there is ample evidence in the record to support that finding and this court is concluded thereby. (*Kusturin v. Chicago & A. R. Co.*, 287 Ill. 306, 319.)

Counsel for appellant insist that the verdict is against the manifest weight of the evidence and for that reason a new trial should have been awarded. In this connection our attention is called to the fact that during the trial, the complaint was amended to charge that the action was brought by the plaintiff by

his daughter, Essie Williams, as his next friend, that the evidence discloses that Johnson was mentally incompetent at the time of the trial, that his memory was unreliable and that from a consideration of all the competent evidence found in this record, the only reasonable conclusion that can be reached is that, as a result of a cerebral hemorrhage Johnson fell from the top of the tender and was injured. It is true that Dr. Martin did testify that, in his opinion, Johnson suffered a stroke. The jury, however, had before it not only the testimony of Dr. Martin, but also the testimony of Dr. Barnes, the attending physician, who testified that during the period of Johnson's hospitalization he concluded that Johnson did not have a cerebral hemorrhage. Dr. Millett, likewise, was of the opinion that Johnson had not suffered a stroke. While Johnson's memory may have been impaired, the jury had before it his testimony as to how the accident occurred as well as all the other facts and circumstances appearing in evidence. In *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U. S. 29, 64 S. Ct. 409, the Supreme Court of the United States had occasion to consider and discuss the sufficiency of the evidence to support a verdict in favor of plaintiff in an action arising under the Federal Employers' Liability Act and in the course of its opinion said: ''It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions and draws the ultimate conclusion as to the facts. The very essence of its functions is to select from among conflicting inferences and conclusions that which it considers most reasonable. (Citations.) That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that

other results are more reasonable.'' We are unable to say that the record in this case does not contain sufficient evidence to sustain a judgment for the plaintiff upon the theory that his fall was not due to a cerebral hemorrhage but the proximate cause of the injuries which Johnson received was the presence of ice on the top of the tender which caused him to slip and fall.

It is next insisted that the trial court erred in denying the motion of the defendant to strike the testimony of Dr. Millett on the ground that this witness was not the attending physician and that his findings and diagnosis were based partly upon subjective symptoms and the history which Johnson gave him. Dr. Millett testified that he examined Johnson on two different occasions, the first being on November 11, 1946 and the second on April 7, 1947. The doctor was then asked: ''What sort of history did you receive?'' An objection was made and sustained. The witness then, without objection, testified that he made a neurological and psychiatric examination of Johnson and described at length what the examination consisted of and stated that he formed an opinion with reasonable medical certainty as to the ailment Johnson was suffering from. Counsel for plaintiff then asked him: ''What did you find?'' An objection was interposed and the court said: ''You can give the opinion as to matters based upon the objective matters, not subjective, at this time.'' The witness then answered: ''I am able to give an opinion as to the objective symptoms this man suffered from, neurologically or psychologically. My opinion was traumatic encephalopathy, by which I mean damage to the brain and nerves as the result of injury. The man's blood pressure was elevated-systolic was 180 and diastolic was 120. This had significance as to the man's general condition. It was considered abnormal, but not responsible for the condition I have named.'' The witness was then asked: ''Based upon your observation of this man at your

examination of him, and based upon your knowledge in, and experience as a neurologist and psychologist, have you an opinion as to a reasonable medical certainty as to whether Peter ᴅM. Johnson was of sound or unsound mind?'' Upon a general objection being made, the court overruled it and said: ''Have you an opinion? Yes or no.'' The witness then gave the following answer: ''I have an opinion that he was of unsound mind. That is still my opinion. The basis of my opinion was his emotional instability, delusional ideas, disorientation as to time, place and person, marked impairment of recent memory, lack of insight, and his morbid mental condition. I have an opinion based upon the objective symptoms and my knowledge of psychiatry and neurology that he is unable to do any work. The basis for that opinion is his marked loss of memory and inability to orient himself. I have an opinion to a reasonable medical certainty based upon the symptoms I have described that this man will be unable to work at any regular employment. I have an opinion based upon my psychiatric science to a reasonable medical certainty that this man will not ever become of sound mind.''

In answer to a hypothetical question the physician then gave it as his opinion that the person described in the question was of unsound mind on November 5, 1945 and not of sound mind at any time during the month of November 1945. Upon cross examination the witness stated that he was not able to tell from his_objective findings alone how long the condition he found Johnson in at the time of his first examination, had been present. The abstract then discloses that the witness was asked the following questions and made the following answers:

''Q. It is also possible that there might have been cerebral hemorrhage which would produce that or lead to a fall and the fall produce the findings that you find with reference to the left eye and the cerebral hemorrhage produce the findings which you found in the bal-

ance of your neurological and psychological examination?''

"A. Yes, sir."

. "Q. There is no way of eliminating that possibility as against the other theory which you have medically?''

"A. Other than the history that was presented to me."

"Q. And so to that extent you are relying on the history that was given to you at the time of your ex amination?''

"A. Yes."

"Q. That forms a part and essential ingredient of the diagnosis which you arrived at?''

"A. It is essential in any examination."

"Q. And particularly in this case, the history which this man gave you at the time of the accident formed an essential ingredient in arriving at the diagnosis which you arrived at?''

"A. Yes."

Upon redirect examination this witness stated that he "formed an opinion that this man did not suffer a stroke on March 7, 1945 and upon recross examination stated that this opinion was based in part upon the history that the man gave him at the time of his examination. The doctor was then excused and a recess taken. Following the recess, counsel for appellant moved the court to strike the testimony of Dr. Millett on the ground that the cross examination of the doctor disclosed "that it is based very largely on subjective matters within the patient's control," and specifically moved to strike the doctor's "answers to all of the hypothetical questions which includes in the assumed facts the diagnosis of traumatic encephalopathy by the examining physician who examined the hypothetical person in November of 1946."

These motions were made outside the presence of the jury and the court stated that subject to what he had said the motion would be denied. Upon the return of

the jury, in their presence and hearing the court said: "The jury is now back. I will say to the jury that the court has stricken out and is striking out all that part of the testimony of the last witness insofar as it relates solely to physical injuries and insofar as it is based on subjective symptoms or subjective evidence, and the jury will disregard that part of the evidence of the last witness so stricken out, and in fact will disregard any evidence which has heretofore been stricken out as to any witness and may be hereafter stricken out as to any witness." Counsel for appellant then said: "I think the jury should be informed as to what subjective symptoms are." And thereupon the court stated: "I think they have already been told that they are those, as I understand it, which the patient himself gives. For instance, in answer to questions he says so and so and in answer to questions he does so and so."

In *Coburn v. Moline, E. M. & W. Ry. Co.*, 149 Ill. App. 132 it appeared that Dr. Dondanville had not treated the plaintiff but with Dr. Sala had examined him for the purpose of giving testimony at the trial and their evidence tended to show a partial paralysis of the plaintiff's arm. Dr. Dondanville described certain tests he had made by sticking pins into the flesh of plaintiff's arm and also by applying tubes containing hot and cold water to different parts of his arm and gave his conclusions founded upon some of these tests. No objection was made to the testimony at the time it was introduced but subsequently counsel for the defendant did move to strike certain portions of the evidence of both Dr. Dondanville and Dr. Sala. The court held that the opinion of a physician is not competent evidence where it is based upon self-serving statements by the patient not made in the course of treatment but with reference to a trial and that the motion to exclude should have been made while the witness was on the stand.

It is not claimed that the court erred in passing upon any objection interposed by counsel to any question asked this witness or that the court erred in ruling upon any motion made while Dr. Millett was on the witness stand. This witness had been excused and had left the court room and the court had been in recess for some time when the motion to strike was made by counsel for appellant. In view of these facts, we do not think appellant has any just grounds for complaint. Its rights were fully protected by the rulings of the trial court. Furthermore Dr. Millett's evidence was, in many respects, corroborative of that given by Dr. Barnes, appellant's physician, who treated Johnson during all the time Johnson was in the hospital following the accident.

It is finally insisted that the court erred in giving certain instructions on behalf of the plaintiff and particularly instructions A and F; that the court also erred in modifying defendant's fourth instruction and in refusing defendant's fourteenth instruction. Instructions A and F were in the language of the Federal Employers' Liability Act, and the Boiler Inspection Act and Rule 153 of the Interstate Commerce Commission. There was no error in giving these instructions (*O'Brien v. Chicago & N. W. Ry. Co.*, 329 Ill. App. 382; *Devine v. Chicago, R. I. & P. R. Co.*, 266 Ill. 248; *Kenna v. Calumet, H. & S. E. R. Co.*, 284 Ill. 301; *Howard v. Baltimore & Ohio Chicago Terminal R. Co.*, 327 Ill. App. 83).

The fourth instruction told the jury that it was not sufficient for the plaintiff to show that the defendant may possibly have been guilty of negligence but that the evidence must point to the fact that it was guilty of the negligence charged in the plaintiff's amended complaint. This portion of the instruction the court gave but eliminated the following, "and if you believe from all of the testimony that the matter

is uncertain and it shows that any one of a number of things may have brought about the injury, for some of which the defendant is responsible and for some of which it is not, it is not for you to guess between these various causes and find that the negligence of the defendant was the real cause when there is no satisfactory foundation in the testimony for that conclusion.'' The portion eliminated assumed that there was no satisfactory foundation in the testimony for the conclusion that the negligence of the defendant brought about the injury to the plaintiff. The jury was fully instructed as to what the plaintiff was required to prove and there was no error in modifying this instruction or in refusing the fourteenth instruction which was as follows: ''You are instructed that the charge that the defendant failed to furnish adequate lighting and a sufficient platform of space for the plaintiff to work are not sustained by the evidence and are not to be considered by you in arriving at your verdict.'' The evidence was such that it would have been error to have given this instruction.

This record is free of reversible error and the judgment will therefore be affirmed.

*Judgment affirmed.*