Edward Hayes, Appellee, v. New York Central Railroad Company, Appellant.

Gen. No. 43,596.

Opinion filed May 6, 1946. Released for publication May 27, 1946.

SIDNEY C. MURRAY, WILLIAM A. MORROW and MARVIN A. JERSILD, all of Chicago, for appellant.

EDWARD B. HENSLEE, of Chicago, for appellee; MELVIN L. GRIFFITH and WALTER N. MURRAY, both of Chicago, of counsel.

MR. PRESIDING JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by defendant from a judgment for $30,000 in favor of plaintiff, entered on the verdict of a jury in an action at law based on the Federal Employers' Liability Act (45 USCA §§ 51–59, §§ 22–34 Federal Boiler Inspection Act, with amendments).

The occurrence on which the action was based took place at Sheff, Indiana, February 19, 1944. The complaint, filed December 29, 1944, alleged defendant was negligent in failing to provide safe appliances with which to work, particularly "in furnishing the plaintiff with an old, worn-out locomotive on which the grate shaker apparatus would lock suddenly while being operated," which defendant "well knew or should have known."

Plaintiff was practically the only occurrence witness. He lived in Indianapolis and was employed by defendant as a fireman. He, with his crew, Gavigan,

engineer, and Roberts, brakeman, was ordered to make a run from Indianapolis to Kankakee, Illinois. A later order changed the destination of the train to Sheff, Indiana. Plaintiff was on engine No. 2313 of the H–10 type. At Altamont, Indiana, they took on coal and water. While waiting for orders plaintiff says he tried to shake the grates and found them stiff. He told Gavigan the grates were "shaking hard." Gavigan said to wait until they got to Sheff and he would help. They got to Sheff about 7 or 8 o'clock in the morning. The crew were switching, making up the train for its return trip. The engine was moving at a speed of about 3 or 4 miles an hour. Plaintiff prepared to clean the fire. He says the grate shaking apparatus was about the same on all H–10 type engines. It consisted of a shaker bar about 2½ to 4 feet long and shaker arms covered with housing. He opened the housing, reached down inside and unlocked the lock that held the arm secure, and placed the shaker bar in the shaker arm. The free end of the lock was lifted up and leaned back against the frame of the engine. Most of the H–10 type engines had safety latches to prevent the worn locks from falling down. Plaintiff says defendant had not so provided for this engine.

Plaintiff, as he operated the grates, was in a standing position. His left foot was between the fireman's seat and the brakeman's seat, which were about a foot apart. His right foot was over the brakeman's box seat. Plaintiff bent over, his head about even with his knees. He tried to lift up the shaker bar. He felt the grates were tight. He let the bar down to the floor, came up again as hard as he could. Plaintiff says: "When we were going down number 2 and 3 track, making three or four miles an hour, I prepared to clean my fire, and that is when I hurt my back. I got my shaker bar out, took the housing off, took the cover back, put the shaker bar on there, lifted the lock

up and tried to shake it. I got in a position—you do not face the boiler but, you face the engineer when you are shaking the grates, and one foot was between the fireman's pedestal seat, a distance of approximately about a foot and the brakeman's seat, box seat; and the right foot was over the brakeman's box seat. That is all the room you have there. And as I was bent away over, and I tried to lift up on the shaker bar, and I felt they were kind of tight, so I let it clear back down to the floor, and I went to come up again as hard as I could, and it just seemed like I hit a brick wall. I just stopped everything. I felt a tear from the end of my spine clear to the back of my head. I looked to see what caused—The lock had fell down. It was not usual and customary for that lock to fall down. As to what caused it to fall, well, it was wore out, I suppose.'' The Court: ''The 'suppose' may be stricken.''

Plaintiff told Gavigan he had hurt his back. He did not finish cleaning the fire. Gavigan did that for him. Gavigan and Roberts did most of his work on the way back to Indianapolis. There he went to the road foreman's office to report the accident and found it closed. Another fireman went home with him, and he went to bed. The complaint charged a fracture of the fourth lumbar vertebra of the plaintiff's spine.

Defendant's first contention is that the verdict is against the manifest weight of the evidence. As we have already said, plaintiff was practically the only occurrence witness. He told just how the accident happened, as above recited. He has not worked since. Plaintiff's uncontradicted evidence showed that Gavigan, the engineer, was present when he was injured and that Gavigan and Roberts on the trip back to Indianapolis performed the services plaintiff would ordinarily perform. At the trial Gavigan and Roberts were present in the corridor of the courtroom but not called as witnesses and returned to Indianapolis

without testifying. Plaintiff's attorneys strongly argued to the jury that the failure of defendant to call these witnesses corroborated the version of the occurrence as given by plaintiff. Whether this was true or not it left the narration of plaintiff uncontradicted by witnesses who were available, and under the orders and directions of defendant. That this had much influence in bringing about the verdict of the jury we do not doubt.

Defendant put in other evidence for the purpose of impeaching the testimony of plaintiff. A boilermaker, who inspected the shaking apparatus before it was taken on the trip to Sheff, and another boilermaker, who inspected it soon after the return from that trip, (both employees of defendant) testified their inspection of the shaking apparatus, disclosed there was nothing wrong with it.

Goodyear, road foreman of engines for defendant at Indianapolis, and Pischner, a clerk in the office of Goodyear, testified plaintiff was asked to make out an accident report when he called at Goodyear's office about a week after the accident, and that plaintiff replied an accident report was not necessary as there was nothing about the engine or condition of the engine that caused his injury. Pischner also said that plaintiff then told him that his doctor had advised him that he was suffering from a bad kidney condition. Goodyear gave testimony to the same effect. Plaintiff denied making these statements.

Defendant offered in evidence a written statement signed by plaintiff. It was received in evidence by agreement, and defendant argues it tends to impeach the testimony of plaintiff. It is a typewritten statement dated March 8, 1944, at Indianapolis, and marked A1, A2 and A3. It covers three typewritten pages. It is signed by plaintiff and also by his wife. At the bottom of the third page defendant wrote: ''I have read this 3 page statement and it is correct to my

knowledge.'' The statement was written by Self, claim agent of the defendant. Plaintiff was cross-examined at length on it. He admitted some of the statements in the paper and denied others.

Near the close of the trial, Dawson, an employee of defendant, (called by plaintiff) whose job was to work at the roundhouse in Indianapolis on the cinder pit as, what he called, a "fire knocker" and shake the fire out of the railroad engine as it came off the road and get it right for the fireman in the roundhouse, was allowed to testify that on February 19, 1944, he held that job. He testified: "The bolt is worn, and it won't hold back. The minute you come up with the shaker bar, it will either hit the back point or front point of the lug and it will drop it down on the shaker staff . . . ." On cross-examination he testified he lived in Indianapolis but was ordered "up here" by his lawyer, Mr. Murray, who was attorney for plaintiff.

The weight to be given to the evidence concerning the written statement was, we think, peculiarly for the jury. The exhibit was written by an agent of defendant. We have read these and the cross-examination and are still impressed (as we think the jury was) with the fact occurrence witnesses, apparently brought from Indianapolis, went back without being called to contradict plaintiff as to the occurrence. Testimony of plaintiff not denied by Gavigan, Roberts or Self, who drew the typewritten statement, does not commend the defense of defendant on the facts. We have not been convinced by defendant's able brief that we should hold this verdict and judgment to be, on the issue of liability, against the weight of the evidence. The sufficiency of the evidence was a Federal question. *Brady v. Southern Ry. Co.,* 320 U. S. 476, 479. Under the circumstances here disclosed, this court would have no right to substitute its own conclusions for those of the jury. *Tennant v.*

*Peoria & P. U. Ry. Co.,* 321 U. S. 29, 32. This first contention is not sustained.

Defendant's second point is that the damages are excessive. The amount allowed is large. Plaintiff's earnings for the year 1943 were $2,966.66. From January 1 to February 18, 1944, he earned $625. Plaintiff testified that he endured considerable pain. His conduct just after the accident did not indicate quite as severe an injury as is now claimed. Plaintiff says: "I couldn't say I remained on the engine after I strained my back, during all the process of making up the train and going back to Indianapolis from Sheff. I might have got down on the ground. . . . I took water, much to my sorrow." The words "much to my sorrow" were stricken. Here we miss testimony by Gavigan or Roberts. Plaintiff was a strong man. At one time he was a prize fighter. Twice he passed successfully physical tests required by defendant of those in its service. While working for Kingen & Company he complained of having hurt his back in carrying a quarter of beef. From April 1935, to June 1941, while working for Kingen, he complained of 64 minor accidents.

Plaintiff's attitude as to medical attention immediately after the occurrence does not indicate such serious injury as is now claimed. The occurrence took place on Saturday morning. Plaintiff reached home a little after noon and went to bed. On Monday he went in a cab to see a chiropractor by whom he had been treated several times before. The chiropractor put hot towels and crushed ice on his back. He saw this chiropractor every day from February 21 until June 10 and received this hot and cold pack treatment. The chiropractor advised x-rays, which were taken but not produced at the trial. Plaintiff's written statement indicates the chiropractor said he had "spinal distortion and congestion in the lower back." Plaintiff saw "the old family physician," Dr. Colloden.

He says the doctor gave him a prescription for "pain pills," which he filled at a drugstore. Plaintiff says: "He is a medical doctor. He didn't give me any treatment. I went to him several times. He cut me off."

June 12, 1944, plaintiff saw Dr. Greenspahn, who took x-rays of his back. Dr. Greenspahn says he found the muscles in the center of the spine "spastic." He says the x-ray of June 12 showed the right side of the fourth lumbar vertebra narrower than the left side. This, he said, could have been a congenital condition; it could also have been caused by trauma. The doctor, replying to a hypothetical question, said: "I cannot state with a reasonable degree of medical and surgical certainty as to just what will develop in the future."

Plaintiff saw at many times doctors provided by the defendant company, Drs. Ensminger, Beeler, Ritchie and Oldberg, all of whom testified in behalf of the defendant. It would serve no useful purpose for this court to discuss the evidence of the experts in detail and thus extend the opinion beyond reasonable length.

The brief of defendant, we think, summarizes well the testimony in regard to the extent of plaintiff's injury. It says:

"It will thus be noted that four outstanding doctors found nothing wrong with plaintiff except his own complaints of pain, as against which there is Dr. Greenspahn's statement that the narrowing of one side of the fourth lumbar vertebra might or could have been caused by trauma; and even he testified that the condition could be congenital so far as the x-ray he was then looking at was concerned. Greenspahn's opinion was based on x-rays taken June 12, 1944, whereas defendant's medical witnesses based their testimony not only on those x-rays but also on three other sets of x-rays, one taken three weeks after the alleged accident, one eight to nine months after that

event and one almost a year after the alleged accident, and were thus able to support their opinion by the absence of anything in the later x-rays showing that there had been a healing process in the interim. Moreover Dr. Greenspahn refused to state 'one way or the other' whether the condition described in the hypothetical question was temporary or permanent.''

The courts of Illinois and Federal courts, also, hold that damages allowed may not be purely speculative. It is sufficient to cite these cases: *Lauth v. Chicago Union Traction Co.*, 244 Ill. 244, 252, and *Shelton v. Thomson*, 148 F. (2d) 1. We hold that the damages allowed are excessive to an extent that would require a substantial remittitur.

However, the judgment in this case must be reversed on account of improper and prejudicial conduct of plaintiff's attorney. The general rule is that a judgment obtained by appeals to passion and prejudice and unfair conduct of the plaintiff's attorney will be reversed and remanded for another trial. *People v. Bimbo*, 314 Ill. 449; *Coal Creek Drainage & Levee Dist. v. Sanitary Dist. of Chicago*, 336 Ill. 11, 45. The Federal courts enforce the rule quite strictly. In *Minneapolis, St. P. & S. S. M. R. Co. v. Moquin*, 283 U. S. 520, the Supreme Court of the United States said:

''In actions under the federal statute no verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice.''

In *New York Cent. R. Co. v. Johnson*, 279 U. S. 310, 318, the same court said:

''The public interest require that the court of its own motion, as is its power and duty, protect suitors in their right to a verdict uninfluenced by the appeals of counsel to passion or prejudice.''

See also *Chicago, M. & St. P. Ry. Co. v. Coogan*, 271 U. S. 472.

█ The question here as to the liability of defendant was close. It was the duty of the trial court to see that the conduct of those taking part in the trial should be free from attempts to appeal to passion and prejudice. The court did not perform his duty in this respect.

Defendant's exhibit No. 4, for identification, was a written statement prepared by Mr. Pischner of the defendant company. It was offered and excluded. Plaintiff's attorney volunteered: "I have no objection. . . . Let the jury see how they make out their reports." Later defendant again offered the exhibit, and plaintiff objected on the ground it was self-serving. He added that there were erasures and corrections on the face of it. Defendant's attorney objected to this statement. Plaintiff's attorney replied: "Yes, there is." Attorney for defendant said: "Well, let the jury see it, then." Plaintiff's attorney answered: ". . . I will let the jury see the erasures and corrections, if you have the nerve to do it." Defendant's attorney: "Wait a minute, wait a minute." Plaintiff's attorney: "He has offered to do this. Now, who is lying?" Defendant's attorney: "High blood pressure here." Plaintiff's attorney: "Yes, high blood pressure. Now, wait a minute. You are lying right in the presence of this jury." Defendant's attorney: "Just a moment." The Court: "Let me see the erasures. I don't know whether there are any." Plaintiff's attorney: "Yes, your Honor, they have been corrected." The Court: "I didn't see any." Attorney for defendant then said: "Pardon me, your Honor, until I make my point now. Now, I object to the conduct of counsel in coming up here to the witness stand, grabbing this paper, this document, Defendant's Exhibit 4, out of my hand and exhibiting it to

one of these jurors; shouting about the question of erasures on here when he has absolutely refused to let this document go to the jury." Attorney for plaintiff: "He says let the jury see the correction and I did." The document was again ruled by the court to be inadmissible. It is in the record. There is apparent on the face of it minor changes, none tending to prove bad faith on defendant's part.

In his argument to the jury, attorney for plaintiff said: "He (plaintiff) said he never told him anything of the sort. 'The report was not made out in my presence,' and because there is an error on minor things which might hurt, counsel tells you there were no corrections in that report, and stands in front of you and says there weren't. I submit to you there were corrections in that report and there were erasures, minor little things, but they wouldn't be what the man had told him, so they corrected those details. Now, I submit to you whether counsel was telling you the truth or not, when he makes that statement in your presence—well, let's get on."

Later in the argument defendant's counsel referred to a statement made to Pischner. Plaintiff's attorney interrupted: "Now, I am going to object to counsel *putting up any phoney report* made out by the railroad company out of the presence of this man."

In his final argument plaintiff made this plea: "Again, a family man with three children going for a period of more than a year, walking around with a brace on his back, running to railroad doctors whenever they called him when he didn't have to do it . . . He is going to have with the best of circumstances to get out there to support that wife and three kids."

In beginning his argument plaintiff's attorney said: "You are to use your own judgment in deciding whether Edward Hayes is a faker or not. That is

the crux of the situation in this case." Later, he said: "Who called who a crook? I didn't say they were crooks. The only one called a crook in this case is the plaintiff, Edward Hayes. . . . Look at Ed Hayes. If he looks like a crook to you and this lawsuit says he is a crook, and if this record says he is dishonest and endeavoring to put over a dishonest claim in this case, I submit to you, I ask you to go down in the bottom of your hearts and figure out if that is the type of case this is and the type of man he is and say this man's actions brought about this case."

It is not necessary to consider other similar remarks by attorney for plaintiff. He states his position: "Plaintiff's counsel had one of two choices: 1. Introduce his direct evidence showing liability and the extent of plaintiff's injuries and sit down calmly and allow the defendant to establish by innuendo, by parading incompetent evidence before the jury, and by questionable, extra-judicial statements, the theory on which defense counsel tried the lawsuit: That there was no accident, and no injuries and that plaintiff was faking the whole case. 2. Put in his direct and positive evidence and aggressively tear that theory apart, and beat the defendant at its own game. Plaintiff's counsel, in the exigency of the trial, chose course number 2. That is all that happened in this case."

Plaintiff cites *Maxwell v. Durkin*, 185 Ill. 546, affirming 86 Ill. App. 257. There the attorneys on both sides were said to have been guilty of unbecoming conduct for which they should have been punished, and the judgment was affirmed for the reason that the conduct of each was reprehensible. Attorney does not point out in this record conduct of the attorney for defendant similar to his own. He compares defendant's attorney, figuratively speaking, with "Goliath advancing with shield and sword against

the slim David," who chose as a weapon "his sling and a smooth stone from the brook." That occurrence was not in a court of justice.

A judgment obtained by conduct of the kind recited will not be allowed to stand in the courts of this State or in the Federal courts.

As the cause must be tried again, we will comment on the instructions. Defendant argues every one given for the plaintiff to be erroneous. No. 1 is not. It merely states the well known rule the preponderance of the evidence does not mean necessarily "beyond a reasonable doubt." Instructions 2, 3 and 4 are in the language of the statute and in each the title of the statute (not a part of it) is included. We disapproved of this kind of instructions in this class of cases in *Spiering v. Chicago & E. I. R. Co.*, 325 Ill. App. 576. Plaintiff's instruction No. 6 is subject to criticism in that it allows recovery for "future loss of health," "future suffering," "future loss of earnings." It also directs the jury to determine "the present value of the total amount of such future loss of earnings" without stating a formula or rule by which the jury could make the computation, even if there had been evidence to support such allowance. Instruction No. 8 also tells the jury that in determining damages the jury should take into consideration "permanent disability" and "future pain and suffering." It also directs the jury to compute "the present value of future loss of earnings" without giving any rule by which the jury could make such computation.

For these errors the judgment will be reversed and the cause remanded.

*Reversed and remanded.*

O'CONNOR and NIEMEYER, JJ., concur.