### FRITZ v. PENNSYLVANIA R. CO.

No. 10121.

United States Court of Appeals
Seventh Circuit.

Oct. 19, 1950.

Rehearing Denied Dec. 2, 1950.

George F. Barrett, John W. Costello, Theodore Schmidt and P. J. Cronin, all of Chicago, Ill. (George F. Barrett, John W. Costello, and Edward Wolfe, all of Chicago, Ill., of counsel), for appellant.

Walter N. Murray, Edward B. Henslee and Melvin L. Griffith, all of Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUF-FY and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This is an action by plaintiff to recover damages under the provisions of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., resulting from the death of her husband while in the employ of the defendant and because of its alleged negligence. The decedent was killed while engaged in switching operations as a yard conductor at the plant of the Parrish Pressed Steel Company, at Reading, Pennsylvania, on February 13, 1948. A trial was had before a jury which resulted in a verdict against the defendant in the amount of $70,000.00. After a denial of defendant's motions for judgment notwithstanding the verdict and for a new trial, the judgment from whence the instant appeal comes was entered.

The chief ground relied upon for reversal is the court's refusal to direct a verdict in favor of the defendant because (a) plaintiff failed to prove the alleged negligence on the part of defendant, and (b) the death of the decedent was solely and proximately caused by his own misconduct. Other grounds urged are that the court erred in refusing to withdraw a juror and declare a mistrial because of alleged misconduct on the part of plaintiff's counsel, and that the court erred in its refusal to grant a new trial because of erroneous instructions given at the request of the plaintiff, the improper admission and rejection of evidence, counsel's alleged misconduct in his argument to the jury, and that the verdict was so grossly excessive as to indicate passion or prejudice on the part of the jury. The case was submitted to this court on briefs and without oral argument.

We shall first consider the evidence insofar as it appears relevant to defendant's contention that it was entitled to a directed verdict. The decedent lost his life while the train crew was preparing to spot a car in one of the buildings of the Parrish Pressed Steel plant at Reading, Pennsylvania. The accident which resulted in his death occurred at about 6:10 p. m. on February 13, 1948. At that time it was dark and the weather was misty and hazy. Decedent had been a conductor for about three days, and previously had been a brakeman. As con-

ductor, he was in charge of the switching crew which had reported for work on the day in question at 3 p. m. The crew at that time was one man short, and consisted of Lingle, the brakeman, Schrader, the fireman, Beaver, the engineer, and the decedent. At 6 p. m., or shortly before the accident, brakeman Harley reported for duty and there was then a full crew. The switch tracks leading into the Parrish Pressed Steel plant premises were known as Nos. 1 and 1A. The accident occurred on the latter track. There was a steel door closing the entrance where track 1A entered the building, which opened upward by means of an electrical motor placed in operation by a push button.

In approaching the building on track 1A, there was a portion of the building which extended outwardly in an easterly direction. The corner of this portion of the building was approximately thirty feet from the place where track 1A entered the building. As the building was entered on track 1A, there was a concrete loading platform on the left hand side of the track, extending as far as two car lengths. As a car entered the building on track 1A, there was a clearance on this side, that is, space between the platform and the car of about seven and one-half inches which widened to a width of about twelve inches at a point fifteen feet inside of the building. On the inside and near the door was a ladder extending from the track onto the platform. On the opposite side of the track there was a clearance of approximately four to twelve feet. On that side there were posted "No Clearance" signs on the building where track 1A entered. On the left hand or platform side, no such signs were posted.

The track inside the building was not level. It sloped toward the door. When cars were spotted inside at the platform, blocks of wood were placed under the wheels to prevent them from rolling out. In railroad parlance they were "chocked." These blocks of wood and other scraps and debris collected on the track by the platform. By reason of these blocks of wood and other debris that collected on the tracks inside the plant, it was necessary that some member of the crew go in and clear the track before a car was backed in. Under the custom previously followed, it was the business of the crew to make sure that the man inside had cleared the track before backing in a car, and this was to be done only on his signal. According to such practice the man inside, after giving the back-up signal, went up the ladder onto the platform so as to be in a safe place and in a position to spot the car properly.

The decedent was an experienced railroad man, thoroughly acquainted with the premises of the Parrish Pressed Steel plant, having worked in and about the premises for a long period of time prior to the accident. In fact, about two hours before the accident the decedent and brakeman Lingle had removed a loaded car of scrap spotted on track 1A inside the building.

The movement which resulted in decedent's death was for the purpose of spotting an empty gondola car on track 1A inside the building at the loading platform. The engine was backing toward the building with the car to its rear. At that time Schrader, the fireman, was operating the engine and Beaver, the engineer, was located on the fireman's side of the engine. The movement was directly in charge of brakeman Harley, and this was his first experience in spotting a car on the involved premises. Previous to the movement, the decedent had entered the building for the purpose of removing the blocks and debris from the rails, preparatory to spotting the car.

Up to this point there is substantially no dispute in the testimony. It is the testimony as to what subsequently occurred which gives rise to the conflicting theories. These theories are dependent for support on the testimony of two witnesses, namely, Harley, the brakeman, and Janda, an employee of the Parrish Pressed Steel Company, who was working on the loading platform about thirty feet from the door and about twelve feet from the edge of the loading platform when the car entered. Harley testified that he rode the lead end of the gondola car as it was pushed toward the building. The movement was stopped at the corner of the building (thirty feet from the doorway en-

trance) on a signal given by Harley with a lighted lantern. At this point Harley alighted from the car and saw the decedent standing six or eight feet inside the door. He testified that the latter at that time carried a lighted lantern in his left hand and a block of wood in his right and was giving a back-up signal with the hand in which he carried the block of wood. Specifically on this point his testimony is as follows:

"Q. And after you had made this stop, you say Mr. Fritz gave you a back-up signal? A. That is right.

"Q. And what kind of signal was that? A. A circular signal.

"Q. With which hand, do you recall? A. The right hand.

"Q. And was that the hand in which he carried the lantern? A. No, it wasn't.

"Q. The hand in which he had the block of wood? A. That is right."

Harley relayed the signal to the engineman and walked alongside the lead end of the car as it backed up toward the entrance to the building. The decedent continued to give the back-up signal as the car was entering or was about to enter the building. At that time, Harley and the decedent were facing each other and the car entered the building at the speed of a slow walk. Harley said he looked toward the engine to make sure that he could see the engineer and when he looked back again the decedent was being rolled between the side of the gondola car and the platform. He gave an immediate stop signal and the train stopped at once. According to Harley, the decedent stood in the same position with his back to the platform wall facing Harley and giving a continuous back-up signal from the time the car stopped at the corner of the building (thirty feet from the door) until the time the car entered the building.

On the other hand, Janda testified that decedent entered the building and walked along the rail of track 1A farthest from the platform. He saw him kick pieces of wood off that rail that had been used to chock other cars and other debris which had collected there. He walked in about forty-five feet on that rail and then crossed over to the other rail nearest the platform, from which he also kicked pieces of wood and debris. The decedent walked back toward the door with his head down, kicking blocks off the rail. He carried a lantern on his right arm. When the decedent reached a point near the end of the platform where Janda thought he would go up the ladder, the car rolled in at the door and caught the decedent between the car and the platform. Janda stated that he did not see the decedent give a signal to anyone and that he saw no one outside the door. No reason is shown why he would not have seen any signal given by the decedent.

Thus we have the testimony in support of the conflicting theories, and it was clearly within the province of the jury to choose the one they believed more reasonable. Ellis v. Union Pacific R. Co., 329 U. S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572; Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916. It seems to us that the version which the jury appears to have accepted is supported by reason and common sense. That the decedent was in a place where he had a right to be and in the discharge of a duty is not open to doubt, and inasmuch as he had previously participated in the same operation he must have realized the danger inherent in the situation. That he would have stood in a known place of danger, continuously giving a back-up signal to Harley until he was crushed between the car and the platform, is highly unlikely. This was Harley's first experience in the operation in question, and it is readily inferable that he was not familiar with the danger involved and was unaware of the custom which required a signal from the person within before the car was pushed through the door. And a jury was warranted in believing that he received no back-up signal from the decedent. Harley's own testimony raises a serious doubt in this respect. (See the part which we have heretofore set out in question and answer form.) It is not reasonable to believe that the decedent was giving a circular back-up signal with his right hand in which he held a block of wood while he carried his lantern in his left hand. A charitable view

of Harley's testimony in this respect is that he might have seen the decedent pick up or toss a block of wood with his right hand and mistakenly took it for a signal. The jury had a right to reject the testimony of Harley and to rely upon that of Janda, which furnishes ample support for the theory that no signal was given by the decedent. A jury could readily infer that the decedent while performing an essential duty assumed from past experience and custom that the car would not be moved in until a signal was given by him, and further, that while engaged in the performance of such duty and with his mind centered thereon, without any signal from him, the car was moved in and he was trapped between it and the platform. We think there was sufficient proof of negligence to take the case to the jury and that the verdict is amply supported in this respect. And by the same token we think the question of the decedent's alleged misconduct as a cause of his death was for the jury.

■ Defendant's contention that the misconduct of plaintiff's counsel was such as to require that a mistrial be declared is predicated upon the following incident. A plaintiff witness had identified a photograph which he had taken and stated that three others were present at the time. Thereupon defendant's counsel inquired, "Who were the others, please?" Plaintiff's counsel objected and among other things stated, "You want to find out the names of the trainmen so the Pennsylvania Railroad can retaliate." The court promptly sustained an objection and instructed the jury to disregard the statement, but ruled that the statement was not so prejudicial as to require a mistrial. With this ruling we agree. See Stanczak v. Pennsylvania R. Co., 7 Cir., 174 F.2d 43, 47.

■ Defendant contends that the court in numerous respects erred in its instructions to the jury. The principal criticism is directed at what is designated as plaintiff's instruction (G) which purported to set forth plaintiff's measure of damages. This instruction is lengthy and somewhat complicated, but we are not convinced that it was calculated to mislead the jury. Moreover, defendant is in no position to attack the instruction in this court. Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part, "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The record discloses that each of the parties at the request of the court submitted instructions. Those submitted by the plaintiff were designated alphabetically and those by the defendant numerically. The court specifically inquired of counsel what, if any, of the proposed instructions were objected to. Plaintiff's counsel objected to none. Defendant's counsel made objections to certain instructions but no specific mention was made of instruction (G). It is true counsel for defendant stated, "For instruction on damages, I believe that is a little bit on the argumentative side if the Court please." Even if it be assumed, which it well may be, that this referred to instruction (G), none of the grounds of criticism now relied upon were mentioned. In fact, it appears that the criticism which defendant now makes was an afterthought. It is quite likely that the trial court would have changed this instruction in some particulars if he had been advised of the specific criticism now made. At any rate, the court would have had an opportunity to do so, and this was the very purpose of Rule 51. Stilwell v. Hertz Driv-urself Stations, 3 Cir., 174 F.2d 714, 715; Hower v. Roberts, 8 Cir., 153 F.2d 726, 729; Palmer v. Miller, 8 Cir., 145 F.2d 926, 930; Williams v. Powers, 6 Cir., 135 F.2d 153, 155.

■ Criticism made of other instructions we think is without merit except perhaps that directed at plaintiff's instruction (C), which informed the jury that at the time of the accident to decedent there was in force and effect the Federal Employers' Liability Act and then proceeded to enumerate the pertinent language of the statute, 45 U.S. C.A. 51. There appears to be some contrariety of view as to the propriety of giving this

36

instruction. In Speiring v. Chicago, E. I. R. Co., 325 Ill.App. 576, 60 N.E.2d 267, it was held to be error and that it "should not have been given" in that case.[1] The same court, however, in the later case of Howard v. Baltimore & O. R. Co., 327 Ill.App. 83, 95, 63 N.E.2d 774, approved the instruction. It has also been approved by other courts. Johnson v. Elgin, J. & E. Ry. Co., 338 Ill. App. 316, 335, 87 N.E.2d 567; Terminal R. Ass'n of St. Louis v. Howell, 8 Cir., 165 F. 2d 135, 139–140; Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 480. True, the latter court expressed the view that the trial court should point out "the specific provisions of the Act which are being invoked in the cause on trial." While this was not done in the instant case, we are unable to discern, in view of what we have heretofore shown, how there could have been any doubt in the minds of the jury as to the negligence upon which the plaintiff relied. At any rate, the weight of authority is to the effect that it is not error to give the instruction, and in any event we hold that it was not reversible error.

■ We have examined the record concerning the alleged misconduct of plaintiff's counsel in his argument to the jury and find defendant's criticism without merit. In the same category can be placed the criticism directed at the admission of certain testimony on behalf of the plaintiff and the court's refusal to admit certain evidence offered by the defendant, with the possible exception of the admission of mortality tables offered by the plaintiff without requiring the plaintiff to tender an appropriate cautionary instruction concerning the use to be made by the jury of such tables. The rule appears to be that the admission of such tables is erroneous in the absence of a cautionary instruction. Thompson v. Camp, 6 Cir., 163 F.2d 396, 403; Avance v. Thompson, 387 Ill. 77, 84, 55 N.E.2d 57; Hann v. Brooks, 331 Ill.App. 535, 548, 73 N.E.2d 624. Defendant did not question the source of the tables but objected to their being received in evidence without a cautionary in-

struction as to the manner in which they could be used. Thereupon, the court advised counsel that he had a right to prepare and offer an appropriate instruction. This counsel did, and the instruction was given. Defendant now contends, as we understand, that error resides in the fact that this instruction was not offered by the plaintiff. This contention ignores the fact that the jury is not advised and has no way of knowing which instructions are offered by the plaintiff and which are offered by the defendant. They all become, when given, the instructions of the court. On the record as made, there is no merit in this point.

■ Lastly, we come to defendant's contention that the verdict of the jury, in the amount of $70,000.00, was so grossly excessive as to indicate passion, prejudice and misunderstanding on the part of the jury, and the trial court for this reason abused its discretion in refusing to set the verdict aside and to grant the defendant a new trial. If our function was to fix the amount of the damages, we think there is plausibility in the contention that the amount allowed is excessive. A logical argument no doubt could be made that Congress should fix the maximum amount which a plaintiff is entitled to recover under the Federal Employers' Liability Act. The glaring discrepancies in the amount of recovery for wrongful death under that Act and for wrongful death in other instances is such as to cast a serious reflection upon the administration of justice because of the inequality produced between different classes of citizens. To illustrate, if Janda (plaintiff's witness who was an employee of the Parrish Pressed Steel plant) had been killed rather than plaintiff's decedent, by the same negligence and under the same circumstances, the maximum amount of recovery by his administrator would have been limited to $15,000.00. Ill.Rev.Stats.1949, Chap. 70, Sec. 2. However, any merit in this argument must be addressed to Congress and not the courts. We must take the law and the situation as we find it. And the fact

1. This case is reported only in abstract form. Our information as to what the court held is taken from defendant's brief.

is that Congress has left the determination of the amount of recovery to a jury and our function as a reviewing court is extremely limited. This court, in the recent case of Larsen v. Chicago & N. W. R. Co., 7 Cir., 171 F.2d 841, at page 845 considered a similar contention and, among other things, stated, "Moreover, it is now well settled that the fixing of the amount of damages in an action for personal injuries is peculiarly within the province of the jury, there being no regular standard by which to measure. [Citing cases.] There is the additional reason that setting aside the verdict was within the discretion of the trial judge, and in this case we will not presume to substitute our reason and experience for his." True, there are cases which have held that the refusal to grant a new trial because a verdict was grossly excessive was reversible error. Among others, defendant cites Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400. In that case, the plaintiff was an infant 13 months of age and for personal injuries was awarded damages in the amount of $160,000.00. The court in reversing the judgment held that it was grossly excessive and that the trial court abused its discretion in the refusal of a new trial. Obviously, such an extreme situation is of no benefit to the defendant here.

Plaintiff's decedent prior to his injury and death was a strong, healthy man, 32 years of age, with a life expectancy of 36 years. He left his wife, the plaintiff, 29 years of age, and two children, 9 and 6 years of age. The evidence shows that he was a frugal, industrious worker and a good provider for his family. Even though we assume that the verdict is excessive, we cannot say it is so grossly excessive as to demonstrate it was arrived at as a result of passion and prejudice. Certainly the trial court did not think so, as is evidenced by his denial of the motion for new trial, and we are without any standard or criterion by which we can conclude that the action of the trial judge was an abuse of discretion. We are, therefore, obliged to deny defendant's contention on this point.

The judgment appealed from is affirmed.