## WETHERBEE v. ELGIN, JOLIET & EASTERN RY. CO.

### No. 10205.

United States Court of Appeals Seventh Circuit.

May 23, 1951.

Rehearing Denied Sept. 21, 1951.

Harlan L. Hackbert, Chicago, Ill. (Knapp, Cushing, Hershberger and Stevenson, Chicago, Ill., of counsel), for appellant.

Michael H. Lyons, Lloyd T. Bailey, Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

DUFFY, Circuit Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60, to recover damages for the death on May 14, 1948, of plaintiff's decedent, John P. Wetherbee, a switchman employed by defendant railway company. At the time of his death Wetherbee was 40 years of age, and had been in defendant's employ for 20 years. He was married, had four children of the ages of 17, 15, 8 and 5 respectively, and prior to May 14 had been in good health.

At the time of his fatal injuries Wetherbee was engaged in his duties as a switchman. The accident occurred on the north J tracks, inside the plant of the Ruberoid Company at Joliet, Illinois, at approximately 2:25 P.M. Wetherbee died as a result of his injuries about 5:50 P.M. on the same day.

The Ruberoid plant is enclosed by a fence, the railway tracks coming through a gate on the north side. About 2:21 P.M. on May 14, one of defendant's switch engines entered the plant through this gate, shoving a Great Northern boxcar which it had picked up outside the fence. Track K, inside the plant, extended in a northerly-southerly direction. The engine and boxcar proceeded on this track until the boxcar coupled onto a Pennsylvania boxcar which had been

standing on the track, Venske, one of the switchmen, making the coupling. On Venske's signal the engine and cars backed on track K until a switch was passed. Wetherbee threw this switch and gave the proceed signal, and the engine then started moving southwesterly on track J, shoving the two boxcars ahead of it. Wetherbee then mounted the front end of the leading car on the engineer's side, and held the grab iron, and his feet were in the stirrup on the side of the car over the wheels. After Venske had given the back-up signal, he started walking to a road crossing located just south of a concrete loading dock. It was his duty to protect this crossing from the oncoming movement. He walked through the field between tracks K and J, and at the point of derailment these tracks are approximately 84 feet apart. He reached the crossing just prior to the accident.

On the west side of and adjacent to track north J there is a concrete loading dock 108 feet long and about 4 feet high. There is a clearance of 5 feet 2½ inches between the east side of the loading dock and the west rail of north J track. Prior to and on the date of the accident, planking extended on either side and between the rails where they were adjacent to the loading platform. Truckers employed by the Ruberoid Company customarily used the dock for loading and unloading trucks and on occasions had used pieces of wood to block the wheels of their trucks when standing at the dock.

The switch engine was proceeding about 3 miles per hour on the north J track when the leading boxcar, upon which Wetherbee was riding, ran up onto a piece of grey colored wood about 61 inches in length, which had been left alongside and inside of the west rail of the track. The leading wheels on the right side of the boxcar first rolled up on this board, and then moved along on the planking 1½ inches outside the rail, for a distance of about 15 feet, and then, as a curve to the left was encountered in the track, the wheels on the forward end of the car continued forward and then veered to the right, and the boxcar started scraping against the face of the loading dock. The first notice by any of the crew that anything was amiss was when the engineer, O'Day, saw Wetherbee's body twist toward the dock and fall. O'Day had his hand on the brake valve and had expected to apply the brakes a few feet farther on, because the movement of the cars around the curve would have carried Wetherbee out of his sight. Upon seeing Wetherbee fall, he applied the brakes immediately, but before the engine and boxcars were stopped, the car on which Wetherbee was riding scraped along the dock for about 15 feet and he was crushed between the dock and the boxcar, sustaining fatal injuries. When the wheels of the boxcar left the rails, no jar was felt in the engine. The first knowledge that O'Day had of the derailment was when he stepped down from the engine to go to Wetherbee's aid. It is likely that Wetherbee also did not realize the car was derailed when the wheels were traveling on the planking, for he gave no warning signal, and did nothing to protect himself.

Plaintiff contends that it is the duty of the railroad to furnish its employees a reasonably safe place to work, and that the duty is non-delegable and follows the servant when working for the railroad at the premises of another. In the case at bar plaintiff claims the negligence of decedent's fellow employees was the proximate cause of Wetherbee's death.

Defendant contends that the responsibility for the board being on the tracks was solely that of the Ruberoid Company, and that Wetherbee himself was the only one of defendant's employees who had either the duty or the opportunity to keep a proper lookout to discover the presence of the board on the tracks.

The trial court denied defendant's motion for a directed verdict, and submitted the issues to a jury upon a general verdict. The jury awarded damages of $80,000. The court thereafter denied defendant's motions for judgment notwithstanding the verdict and for a new trial.

Rule 103 of defendant's rules provided: "When cars are pushed by an engine * * a trainman must take a conspicuous position on the leading car; when pushing cars on curves or where the view is obstructed, trainmen must be spaced on the cars so as

to insure safe movement. Employee riding the leading car must maintain a sharp lookout ahead and regulate the movement by proper hand signal. Other employees on the engine or cars must be prepared to act promptly on such signals. When shifting cars over public crossings at grade not protected by a watchman, or by gates, a member of the crew must protect the crossing." And Rule 101 of defendant's safety rules provided: "Employees are cautioned to be on the lookout for overhead or side obstructions along tracks, engines or cars on adjacent tracks and rubbish or obstructions near tracks, when riding on, or in getting on or off engines or cars."

The Federal Employers' Liability Act provides that a railroad carrier, while engaged in interstate commerce, shall be liable in damages to any employee "for * * * injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, * * *." 45 U.S.C.A. § 51.

■ It will be observed that the act imposes liability if the injury to the employee resulted in whole or in part from the carrier's negligence. If there is evidence to sustain a jury finding that defendant's breach is a "contributing proximate cause" of the injury, a verdict for the plaintiff will be sustained. Carter v. Atlantic & St. Andrews Bay Railway Co., 338 U.S. 430, 435, 70 S.Ct. 226, 94 L.Ed. 236. But the act does not make a railroad company an absolute insurer against personal injuries suffered by its employees. Wilkerson v. McCarthy, 336 U.S. 53, 61, 69 S.Ct. 413, 93 L.Ed. 497. The questions remain, Was the carrier negligent, and if so was such negligence a proximate cause of plaintiff's injuries? Tiller v. Atlantic Coast Line Railroad Co., 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610. Negligence still is the test of liability.

■ We are unable to discover any evidence in the record to warrant a finding that defendant's negligence caused the board responsible for the derailment to be alongside the west rail of the track. This board, or similar boards or blocks, were not used by nor were they brought into the Ruberoid Company plant by any employee of the defendant. Such boards were not used in any way to further the work of or assist employees of the defendant. It follows, we think, that the defendant was not negligent because the board was left upon the track. The question of whether defendant's employees should have discovered before the accident that the board was left upon the track will be discussed in considering plaintiff's charge that all of the other members of the switching crew were negligent.

Due to the fact that the color of the board causing the derailment was quite similar to that of the planking upon which it in part rested, it probably was not readily observable to a person who glanced casually at it. However, an examination of the photographs (plaintiff's Exhibit 18 and defendant's Exhibits 20 and 23), which show similar planking adjacent to the point of derailment, demonstrates that the board lying closely enough to the rail to cause a derailment could have been seen by anyone *looking down the track* in its direction. Nothing in the evidence indicates that this board had been alongside the track for more than a short time. Some evidence was introduced to the effect that within a few hours previous to the accident a truck of the Ruberoid Company had been seen at the loading dock.

Supporting its contention that defendant did not furnish Wetherbee with a safe place to work, plaintiff relies on such cases as Porter v. Terminal Ry. Ass'n of St. Louis, 327 Ill.App. 645, 65 N.E.2d 31; Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473; Grand Trunk Western R. Co. v. Boylen, 7 Cir., 81 F.2d 91; and Divine v. Delano, 272 Ill. 166, 111 N.E. 742. But these cases involved accidents where permanent structures had been erected allowing insufficient clearance, or where objects had long been permitted, with the knowledge of the railroad company, to remain on or near the tracks, thereby presenting a fact situation distinguishable from the case at bar. Here the board was a *new* threat to safety, not something about which the rail-

road itself had previous knowledge, even though boards had on some previous occasions been found on or near tracks in the Ruberoid plant.

Plaintiff insists that Wetherbee's fellow employees, engineer O'Day, fireman Harrington, switchman Venske, section foreman Wagner, and Delander, in charge of switching operations, all were negligent, and that as a result the defendant did not furnish decedent a reasonably safe place in which to work.

The engineer and fireman were located about 110 feet from the front end of the car on which Wetherbee was riding. Due to the curve in the tracks, and the overhang of the boxcars, neither of them could see the west rail of the tracks. The engineer kept his eye on Wetherbee, watching for any signal from him, for Wetherbee at the time of the accident was in charge of the movement. The engineer's hand was on the brake valve, ready to apply the brakes upon receiving such a signal from Wetherbee. He did promptly apply the brakes when he saw Wetherbee's body twist and disappear. We are unable to find evidence of negligence in any act or omission of the engineer.

Plaintiff argues that if fireman Harrington had kept a proper lookout he would have known when the front trucks of the leading boxcar had left the rails, could have warned the engineer to stop the train, and prevented the accident. Plaintiff also argues that Harrington was negligent in watching the crossing which they were approaching, rather than concentrating his attention on the leading boxcar.

Admittedly Harrington was in his proper place in the engine. He was looking forward and, though watching the crossing, he could at the same time, without changing his glance, see the east front edge of the leading boxcar. Wetherbee was not in his sight, for he was on the west side of the car. No jolt or jar was felt in the engine as the wheels of the boxcar rode on the planking. Harrington described what he saw of the accident as follows: "When I first saw the plank break up, I turned my head toward the engineer, and I saw he was already making his stop." A careful examination of the record does not disclose any evidence of negligence on the part of Harrington, nor permit any such inference.

At the time of the accident the foreman of the switching movement, Earl Delander, was in the rear of the engine, reading his orders. Although the crew had been on the premises less than 4 minutes, plaintiff argues that Delander himself should have inspected the tracks or detailed some other employee to do so. Plaintiff also charges Fred Wagner, the section foreman, with responsibility for inspecting the tracks. We do not find any evidence of negligence by either Delander or Wagner. The latter had not even been on the premises that day, and there is no evidence that in the performance of his duty he should have been there. Delander knew that Wetherbee was on the front end of the movement where, under Rule 103, *he* had the duty to "maintain a sharp lookout ahead." Granted that defendant railway had a duty to have someone inspect the tracks before the cars and engine passed, it was Wetherbee's duty to make that inspection by watching the track ahead of the movement.

On the questions of safe place to work and alleged negligence of O'Day, Harrington, Wagner and Delander, the case of Killian v. Pennsylvania R. Co., 336 Ill.App. 152, 82 N.E.2d 834, certiorari denied 338 U.S. 819, 70 S.Ct. 63, is persuasive. The plaintiff, who was riding the lead end of a cut of cars being moved into the Mallory Company plant, was brushed off the car by some barrels which were standing close to the track in the plant. Plaintiff sued the railway under the Federal Employers' Liability Act, and the Mallory Company under common law theory of recovery. The court said: " * * * It does not appear that the railroad company had any duty to maintain the premises in question, which was owned and maintained by the defendant Mallory Company. The only theory upon which the railroad company could be charged with failing to use reasonable care in affording plaintiff a safe place to work was in the failure to keep this track clear of impedimenta. At the time and place of this accident, according to his own testimony plaintiff himself was the agent of the railroad company charged with the duty of keeping

this spur track clear for the safe movement of his train. Under such circumstances, this became a safe or an unsafe place to work according to whether or not plaintiff performed or failed to perform his duties. * * * While contributory negligence constitutes no defense under the Federal Employers' Liability Act, nevertheless some underlying act of negligence on the part of the employer must be established before he is liable to the servant. The plaintiff has proven no negligence on the part of the railroad company in the care used to afford plaintiff a safe place to work."

After Venske, the remaining member of the crew whom plaintiff charges with negligence, had signalled for the engine to back up on track K, his next duty was to protect the crossing on north J track just south of the loading dock. The evidence is uncertain as to what course he took between the two points. Plaintiff argues that there was a reasonable basis in the evidence for the jury to have found that Wetherbee felt secure in the belief that Venske, a switchman of 27 years experience, would, in proceeding the cars down the track, perform his duty to determine whether the track was safe for the subsequent movement of the cars. Plaintiff also asserts that by placing a ruler on the map in evidence, to show a line between the point where Venske started toward the crossing and the point on the west rail of north J track where he stopped, the line would designate a course within 5 to 7 feet of the west rail on north J track at the point of derailment. Venske testified, "So when I kept walking down that way, I looked over. I couldn't see any obstructions or anything." He also was asked, "You walked directly from that point down to this point?" and his answer was, "Yes, sir."

█ Though Venske's testimony was indefinite on this important point, we think the evidence was sufficient to take the case to the jury, and that the inference that Venske did pass within 5 to 7 feet of the board on the track was permissible. O'Day and Harrington each testified that it was the duty of all members of the crew to watch the surroundings and to keep a lookout at all times for debris and obstructions along the track. It was therefore a permissible conclusion that Venske's failure to notice the obstruction on the track constituted negligence which proximately caused the injuries to decedent. The inference is also permissible that Venske did precede the cars down north J track to the crossing. On another trial the evidence might show that Venske did not in fact walk a course near the north J track or that he did not precede the cars down the track, but on this appeal we may only consider the record before us. An appellate court may not reweigh the evidence and set aside the verdict because the judges would draw different inferences and conclusions than the jury drew, or because they think that another result would be more reasonable. Tennant v. Peoria & P. U. Ry. Co., 321 U. S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520. "Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Lavender v. Kurn, 327 U.S. 645, 653, 66 S. Ct. 740, 744, 90 L.Ed. 916.

█ Defendant insists that the award of $80,000 was excessive, and we agree. Providing plaintiff is entitled to recover, it is for such damages as would justly compensate her and the surviving dependent children for the pecuniary loss suffered by them. It was the duty of the jury to determine the amount of money or property which the evidence showed it was reasonably certain that decedent would have contributed to his wife in the future and to his children during their minority. The district court correctly instructed, "In determining the amount of damages to be awarded for loss of future financial contributions to the widow and children, you are instructed you are to determine the present cash value of such future lost contributions." In addition to the then present cash value of the loss of future contributions to the wife and children, it was proper for the jury to make an allowance for any conscious pain and suffering endured by decedent during the period of about 3½ hours between the time of the accident and the time of his death.

According to the American Experience Table of Mortality, in evidence, Wether-

bee's life expectancy was 28.18 years. He had earned an average of $4,448 a year over a period of the preceding 7 years. His take-home pay, however, was not in that amount because of deductions for federal income tax and retirement benefits. An actuarial witness testified that at the rate of 3% interest, the then present value of annual payments of $4,445 was $83,761, based on a life expectancy of 28.18 years. Using another mortality table, in evidence, the amount would be $88,652. Defendant objected to the testimony of the actuarial witness in this respect, pointing out that railway switchmen do not continue to work as switchmen until they are 68 or 71 years, or past the age of compulsory retirement, and that a man's future earnings should be calculated on the length of time he may expect to be employed, rather than on the time that he can be expected to live.

 The way the amounts awarded in verdicts in personal injury cases have been rapidly increasing is a matter of concern to all who are interested in a fair and orderly administration of justice. If the amounts awarded in the next decade keep pace with the rate at which they increased in the last decade, in certain areas at least, verdicts of $150,000, $200,000, $250,000 or even greater sums may be expected. Even allowing for the decreased purchasing power of the dollar, many of the recent large awards for damages are not justified. Of course a trial judge has the power to remedy the injustice of an excessive award by insisting on a remittitur as an alternative to a new trial, a practice which has been approved in federal court trials since Northern Pacific Railroad Co. v. Herbert, 116 U.S. 642, 646, 6 S.Ct. 590, 29 L.Ed. 755. But if a federal trial judge approves an excessive verdict, the quite generally accepted rule is that, barring

reversible error on other grounds, the appellate court is powerless to provide a remedy.[1] Regardless of how apparent in the record the injustice of the award is, the appellate court must sit supinely by and say, "We are sorry, but we can't do anything about it."[2] Many cases cite the rule stated in Southern Railway-Carolina Division v. Bennett, 233 U.S. 80, 87, 34 S.Ct. 566, 567, 58 L.Ed. 860: "* * * It may be admitted that if it were true that the excess appeared as matter of law,—that if, for instance, the statute fixed a maximum and the verdict exceeded it,—a question might arise for this court. But a case of mere excess upon the evidence is a matter to be dealt with by the trial court. It does not present a question for reexamination here upon a writ of error. * * *"

The historical limitation of the writ of error to matters within the record, of which a motion for a new trial was not a part, formerly presented a procedural obstacle to appellate review. However, this is no longer a difficulty. The procedural obstacles which originally prevented appellate review no longer exist. Rule 75, Federal Rules of Civil Procedure, 28 U.S.C.A.; see also: Fairmont Glass Works v. Coal Co., 287 U.S. 474, 482, 53 S.Ct. 252, 77 L.Ed. 439.

This court has adhered to the rule that it will not review a judgment for excessiveness of damages. Buchanan v. Chicago & N. W. Ry. Co., 7 Cir., 159 F.2d 576; Larsen v. Chicago & N. W. R. Co., supra; Fritz v. Pennsylvania R. Co., 7 Cir., 185 F.2d 31. We also have held that passion and prejudice of the jury will not be inferred from the mere excessiveness of the award. Larsen v. Chicago & N. W. R. Co., supra. However, the writer of this opinion favors following the example of the Courts of Appeals for the Fourth[3] and Ninth[4] Circuits

1. Bissonette v. National Biscuit Co., 1 Cir., 100 F.2d 1003; Powers v. Wilson, 1 Cir., 110 F.2d 960; Herzig v. Swift & Co., 2 Cir., 154 F.2d 64; Sun Printing & Publishing Ass'n v. Schenck, 2 Cir., 98 F. 925; Reid v. Nelson, 5 Cir., 154 F.2d 724; Consumers Power Co. v. Nash, 6 Cir., 164 F.2d 657; Grand Trunk Western Ry. Co. v. Gilpin, 7 Cir., 208 F. 126; Larsen v. Chicago and North Western Ry. Co., 7 Cir., 171 F.2d 841; Chicago and North Western R. Co. v. Green, 8 Cir., 164 F.2d 55; Behrman v. Sims, 81 U.S.App.D.C. 303, 157 F.2d 862.

2. "The members of the Court think the verdict is too high. But they also feel very clear that there is nothing the Court can do about it." Scott v. Baltimore & O. R. Co., 3 Cir., 151 F.2d 61, 64.

3. Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 4 A.L.R.2d 1064.

4. Cobb v. Lepisto, 9 Cir., 6 F.2d 128.

in the abandonment of this strict rule, and holding that where a verdict is grossly excessive, the refusal of the trial court to grant a new trial is an abuse of discretion constituting reversible error.

A recent decision of the Supreme Court gives some indication that such a rule would be approved. In Affolder v. N. Y. C. & St. L. R. Co., 339 U.S. 96, 101, 70 S.Ct. 509, 511, 94 L.Ed. 683, the court said: "We agree with the Court of Appeals that the amount of damages awarded by the District Court's judgment is not monstrous in the circumstances of this case. * * *" This language indicates that if the award had been grossly excessive or "monstrous" the appellate court would have the power to review and reverse same.

 However, following the precedents hereinbefore cited, we hold that the judgment below cannot be reversed merely on the ground that the amount awarded by the jury was excessive.[5]

After stating the rule that the trial judge alone has the right and the duty to set aside the verdict for excessiveness of the award, this court said in Buchanan v. Chicago & N. W. Ry. Co., supra, 159 F.2d at page 578: "* * * However, the reviewing court can, if it thinks the verdict is not according to the weight of the evidence, scan the trial more closely for error. * * *"

We do so here, and proceed to examine the alleged errors which defendant contends entitle it to a new trial.

 Defendant asserts as error that the jury failed to take into account decedent's contributory negligence. The trial court submitted a general verdict to the jury. It is difficult to ascertain from this form of verdict whether the jury found decedent guilty of any contributory negligence, and if so, to what degree. In a special verdict the jury would have been required to specifically answer such questions. The trial court correctly instructed that contributory negligence by Wetherbee

proximately contributing to his injuries did not bar a recovery, but that if such contributory negligence be found, plaintiff's damages should be diminished in proportion to the amount of negligence attributable to decedent. The fact that the verdict is within a few thousand dollars of the present cash value of all that decedent might reasonably have earned during the entire period of his life expectancy demonstrates quite clearly that the jury did not diminish the damages by any appreciable amount. We think as a matter of law plaintiff's decedent was guilty of some contributory negligence. Contrary to his specific duty, Wetherbee did not maintain a sharp lookout ahead, for nothing obstructed his view and he could have seen the board if he had looked. It was the jury's duty, upon finding contributory negligence, to diminish the damages "in proportion to the amount of negligence attributable to" the decedent. Although so instructed, the jury disregarded both the evidence and the instructions. "A jury does not have the power to render a capricious and arbitrary verdict in total disregard of the evidence." Gay, Sullivan & Co., Inc. v. Glaser, Crandell Co., 7 Cir., 102 F.2d 149, 150. We hold that under the circumstances of this case the verdict rendered was arbitrary and capricious, and must be set aside.

The actuary, Wolfman, testified as to the cash value at the time of the trial of decedent's probable future gross earnings. He admitted that in his calculations he did not take into consideration the possibility of Wetherbee's disability from illness or accident, or the matter of voluntary retirement. Likewise his computations were not based on the amount of decedent's take-home pay. Defendant urges that this testimony was based upon two false and incompetent premises: (1) that decedent's probable future earnings may be calculated on the basis of life expectancy instead of the length of time he may expect to be employed; (2) that his dependents' loss of future benefits may be calculated on de-

5. This court intimated in Fritz v. Pennsylvania R. Co., supra, 185 F.2d at page 37, that there was some limit beyond which we would not go. Referring to Virginian Ry. Co. v. Armentrout, supra,

where the jury had awarded $160,000, we said, "Obviously, such an extreme situation is of no benefit to the defendant here."

cedent's probable future gross earnings rather than on his probable contributions for their support. Defendant objected to the admission of the actuary's computations, but was overruled. Defendant relies heavily on the case of Avance v. Thompson, 387 Ill. 77, 55 N.E.2d 57, 60. That court, after pointing out that a jury is likely to be confused as to the application of mortality tables in a personal injury suit, said: "The jury should be carefully instructed as to the purposes for which such tables may be considered in fixing pecuniary damages. It should be advised that the expectancy of life should not be used as a factor by multiplying the years of expectancy by the annual earnings, because to allow this would permit this plaintiff to receive in advance forty years earnings without consideration of other circumstances which might materially reduce his pecuniary loss. "There are some authorities which hold that where mortality tables are given in evidence defendant cannot complain, in the absence of a request for instructions to define their use. We think the use, alone, of the years of life expectancy in such tables has such probability of confusing a jury that a failure to explain their application by instructions from the court would have a prejudicial effect."

 Admission of Mortality Tables into evidence in the absence of a cautionary instruction has been held to be error. Fritz v. Pennsylvania R. Co., supra, 185 F.2d at page 36; Thompson v. Camp, 6 Cir., 163 F.2d 396, 403; Avance v. Thompson, supra. While the district court in the case at bar did not refer to the tables specifically, mention was made of Wetherbee's life expectancy, and the jury was told to consider that all persons do not live to the age of expectancy, especially in hazardous occupations, that their earnings may not remain stationary, and that the reasonably to be expected contributions may vary or diminish in the future. We hold that the admission of the tables themselves was not error, but the calculations made by the actuary, which were based in part on the tables, is another matter. His testimony of his calculations was merely to assist the jury on

the matter of computing, and he could not properly be permitted to use as the basis for his calculations, figures or elements which the jury could not use. The only figure the jury was authorized to use to reduce to its present cash value was the pecuniary benefits which the beneficiaries might reasonably have received from decedent. The jury was undoubtedly misled by the actuary's figures of $83,761 and $88,652, based on decedent's probable future gross earnings. We think the receipt of this testimony over defendant's objections was error.

 The district court instructed, "The present cash value of the pecuniary benefits of which the widow and children have been deprived on account of the death of the deceased, making adequate allowance for the earning power of money, is the proper measure of recovery." Defendant requested the court to furnish the jury a rule by which to determine such present cash value. In Hayes v. New York Central R. Co., 328 Ill.App. 631, 644, 67 N.E.2d 215, 221, an Employers' Liability Act case, the court in referring to an instruction said: "* * * It also directs the jury to compute 'the present value of future loss of earnings' without giving any rule by which the jury could make such computation." However, the court did not hold the instructions as given to be reversible error. See: Free v. Chicago Motor Coach Co., 341 Ill.App. 552, 95 N.E.2d 522, appeal denied 342 Ill.App. i. The defendant herein did not suggest any rule to the court, and of itself we would not regard the court's failure to furnish a rule as reversible error, although the jury should be given all possible assistance in its attempt to justly compute complicated damages.

 Over the objection of defendant the trial court gave six instructions which repeated the duty of the defendant to furnish a safe place to work. In a negligence action the instructions should not give undue prominence to particular issues or theories. 65 C.J.S., Negligence, § 281, p. 1225; Wrigley Co. v. Standard Roofing Co., 325 Ill.App. 210, 59 N.E.2d 510. Such

frequent ·repetition of the phrase, "safe place to work," might lead a jury to believe that the fact of injury, rather than negligence, was the test of liability. By itself we do not consider the reiteration sufficient for reversal, especially in view of the fact that two of the instructions given were requested by the defendant. Upon a new trial, however, we think such instructions could be rephrased to eliminate to a considerable extent the reiteration complained of. We make the suggestion, realizing that on the whole the instructions were excellent.

■ The trial court denied the defendant leave to file a third-party complaint setting forth a claim for indemnity against the Ruberoid Company. The court might well have granted such motion,[6] but we feel such matters rest in the discretion of the trial court. Baltimore & O. R. Co. v. Saunders, 4 Cir., 159 F.2d 481; State of Missouri v. Fidelity & Deposit Co., 8 Cir., 179 F.2d 327; 1 Moore, Federal Practice, p. 356. We hold that denying the motion was not an abuse of discretion, and that refusing defendant's proferred instruction, to propound the theory that the Ruberoid Company was solely negligent, was not error.

Defendant alleges several additional errors in the instructions. Suffice to say that we have carefully considered defendant's contentions with respect thereto, but hold them to be without merit. However, we feel the defendant was prejudiced by the totality of the errors enumerated, and the judgment of the district court is therefore reversed and the cause remanded for a new trial. It is so

Ordered.

KERNER, Circuit Judge, concurs in the result.

6. Rule 14, Federal Rules of Civil·Prccedure.